*In re* ASHLEY K., A Minor.

First District (3rd Division)   No. 1—90—3635

Opinion filed April 17, 1991.

Roland Burris, Attorney General, of Springfield (Cathy Ann Pilkington, of Department of Children and Family Services, of counsel), for appellant Department of Children and Family Services.

Bickel & Brewer, of Chicago (Robert P. Cummins and Kass A. Plain, of counsel), for appellants Joseph Procopio and Marjorie Procopio.

Patrick T. Murphy, Public Guardian, of Chicago (Kathleen G. Kennedy and Sheila Maloney, of counsel), for appellant Ashley K.

Randolph N. Stone, Public Defender, of Chicago (Julie M. Campbell, Assistant Public Defender, of counsel), for appellees.

James S. Montana, Jr., of Chicago, for *amicus curiae* Jim Edgar.

JUSTICE RIZZI delivered the opinion of the court:

This appeal originates from an order of the circuit court which precludes a six-year-old child, Ashley K., from receiving any therapy and precludes visitation between the child and her former foster parents,

Joseph and Marjorie Procopio, with whom the child lived for the first five years of her life. We granted a petition for leave to appeal filed by the Department of Children and Family Services (DCFS), pursuant to Rule 306(a)(1)(v) (134 Ill. 2d R. 306(a)(1)(v)). The Cook County Public Guardian, Patrick T. Murphy, and the Procopios joined in the appeal. The Governor of Illinois, Jim Edgar, appeared as *amicus curiae*. Ashley's mother and father are the appellees. We reverse the circuit court order and remand with directions.

Ashley was born on April 27, 1984, at Norwegian American Hospital in Chicago. There had been no prenatal visits for medical care. Ashley, however, was born one-month premature and addicted to heroin. At birth, she had tremors from heroin withdrawal.

Ashley's mother, age 28, and father, age 32, were not married, but they were living together since 1980. Both of them were drug addicts. Ashley's mother was addicted to heroin and cocaine during the time that she was pregnant with Ashley. She had been using heroin and cocaine throughout the pregnancy. Ashley's mother "said that she stopped drug use three days prior to Ashley's birth." Serum drug screening of Ashley just after birth was therefore negative. It is reported that cocaine will show up in a woman's newborn only if it is ingested within 48 hours of delivery.

In addition to a history of drug abuse, Ashley's mother has a history of prostitution. Moreover, she was prostituting during her pregnancy with Ashley. Two reports in the record are revealing as to the nature of Ashley's mother and father.

One report states:

"Gradually their drug use increased and they had some trouble supporting their habits. He was not working at the time and they were living off of her Social Security and Public Aid. The father found out that the mother was using prostitution to support them when he went out to the store and saw her get into a car with someone she did not know."

Another report states:

"At its worst the drug addiction cost $300.00 per day between the two of them. The father was not working at the time of their addiction, because both of them were just 'too sick.' The mother reported she never stole to get drugs, but she did prostitute herself, while the father watched the kids. She always 'worked' just enough to get the necessary drugs which she took home and used, often with the father."

Drug abuse, prostitution and the unplanned pregnancy were not the only problems facing Ashley's mother and father at the time of

Ashley's birth. Although Ashley's mother and father were not married and "undomiciled," they had an open case with the DCFS regarding two other children, an older girl, born July 2, 1974, and a son, born June 7, 1978. The two other children were from Ashley's mother and her deceased husband, who had died at age 27.

When Ashley was born, her mother and father had five DCFS reports of inadequate and unsafe housing involving Ashley's older sister and brother. For example, on one occasion, September 11, 1983, the family was found to be living in a car. On another occasion, April 30, 1984, a DCFS report revealed no appliances in the home other than a hot plate and no furniture other than two mattresses and a dresser in the apartment. In addition, Ashley's mother had a criminal conviction for neglecting her older daughter when she was 14 months old.

On the day after delivery, Ashley's mother was informed that she would not be able to take Ashley home. Protective custody of Ashley was taken by the DCFS on May 2, 1984. On May 3, 1984, the DCFS filed a petition for adjudication of wardship for Ashley on the basis that she was a neglected and dependent minor within the purview of sections 2—4 and 2—5 of the Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, pars. 702—4, 702—5). Also, on May 3, 1984, the circuit court found that Ashley was a neglected and dependent minor and entered an order placing Ashley in the temporary custody of the DCFS and appointed a guardian *ad litem.*

Ashley's mother was discharged from the hospital 2½ days after Ashley was born. Ashley was discharged from the hospital on May 7, 1984. Ashley's mother did not visit Ashley while Ashley was in the hospital. Ashley's mother claims that "they lied" to her and told her that they put Ashley in a home when Ashley was still in the hospital.

After Ashley was discharged from the hospital, she was placed in a DCFS emergency foster home. On June 7, 1984, when she was 5½ weeks old, Ashley was replaced in a Lutheran Children and Family Services (LCFS) foster home. The LCFS foster parents, Joseph and Marjorie Procopio, had previously gone to the LCFS to adopt a child. The Procopios, however, were led to believe that if they became licensed foster parents it would enhance their chances of being able to adopt a child. They, therefore, went to classes and were licensed as foster parents in April 1984, about a month before they became Ashley's foster parents.

The "Procopios are an attractive middle class couple" who present themselves "as intelligent, mature" residents of Bridgeview, Illinois. They have been married since 1982. Mr. Procopio, who was 58 in 1984, has six grown children from a previous marriage. Mrs. Procopio, who

was 42 in 1984, has a grown daughter. Together, they have eight grandchildren.

A report in the record states: "At the time the Procopios became Ashley's foster parents, the Procopios understood that Ashley was 97% adoptable. The Procopios, who from the outset were looking for an adoptable child, apparently were led to believe that if they took the proper steps to get licensed as foster parents and, one year after her placement, filed the proper papers to adopt Ashley, the adoption would proceed without any difficulty. This scenario was reportedly verified by the agency."

When Ashley went to live with the Procopios, she suffered from tremors, fever, severe diarrhea and long periods of crying. She would cry and stiffen out, and kind of vibrate. The tremors lasted for at least five months.

From the time that Ashley was discharged from the hospital on May 7, 1984, the first meeting that Ashley's mother and father had with her was on June 14, 1984, when they accompanied a DCFS worker to see Ashley. The Procopios brought Ashley to the LCFS office for the visitation. Thereafter, however, the mother and father failed to attend scheduled visits with Ashley on July 2 and August 6, 1984. They also failed scheduled visits with Ashley on July 16 and August 20, 1984. Mailgrams were sent by the LCFS prior to the appointments. A certified letter sent August 31, 1984, was "returned as moved, left no address."

During the first 16 months of Ashley's life, she was visited by her mother three times and twice by her father. In January 1985, the DCFS told Mrs. Procopio that Ashley's maternal grandmother was interested in adopting Ashley. This led to Ashley visiting with her mother and father and her maternal grandmother on February 25, 1985. A report in the record states: "It was Mrs. Procopio's impression that Ashley's maternal grandmother did not want Ashley after Ashley cried continuously for one hour and Ashley's mother did not want to hold her at all. In any case, the Procopios were reportedly told by the agency that the maternal grandmother could not adopt Ashley in the future. In contrast to this report, the LCFS's notes from February 25, 1985, stated the maternal grandmother did not adopt Ashley because she had no employment and worried she could not manage the baby due to a bad back."

During this period of time, Ashley's mother's conduct and lifestyle remained unchanged. She was reported using heroin in March 1985. Her police arrest record at the time is also telling of her conduct: "Sept. 24, 1973—Theft; Jan. 27, 1975—Child neglect (6-months super-

vision); May 15, 1984—Prostitution; June 25, 1984—Prostitution; May 29, 1984—Possession stolen property; Aug. 28, 1984—Possession stolen property; Nov. 13, 1984—Prostitution; Feb. 11, 1985—Forgery; Mar. 06, 1985—2 year felony probation plus $525.00 restitution theft." Ashley's father had also been convicted of forgery. His forgery conviction resulted in probation for five years.

Despite the criminal and anti-social conduct of Ashley's mother and father, a service plan was developed by the DCFS on April 25, 1985, to work toward the goal of returning Ashley home and maintaining her older sister and brother in the home. On May 8, 1985, however, the circuit court made findings that "Ashley's parents are unfit, or unable for some reason other than financial circumstances alone, to care for, protect, train, or discipline Ashley, or are unwilling to do so, and that appropriate services aimed at family preservation and family reunification have been unsuccessful in rectifying the conditions which have led to such a finding of unfit or unable to care for, protect, train or discipline Ashley, and that it is in the best interest of Ashley to take her from the custody of her parents."

In addition, on May 8, 1985, the court granted guardianship of Ashley to the DCFS with right to place. At the time, Ashley continued to experience withdrawal tremors intermittently, sleep disturbance, and high fevers that required frequent visits to a clinic. Despite these problems, Ashley's other developmental processes seemed to be progressing while Ashley was living with the Procopios. The September 4, 1985, DCFS service plan update, however, continued to work towards the goal of returning Ashley to her mother and father.

Although the mother and father were allowed visitation privileges with Ashley, they saw her on only seven occasions during the entire year of 1985. Ashley's mother "said it was hard for her to be with Ashley at this time as she was often 'sick' (from drugs), and she felt Ashley could not feel comfortable with her." After the visits, "Ashley was very upset, refused to take naps, had trouble sleeping, and would not eat."

At this point, the Procopios were quite upset about Ashley's experiences with her mother and father. In response, they were told by the DCFS that the mother and father "will never make it," and never get into rehabilitation for drug addiction. Rather than being placated, "when the Procopios heard this, they found it difficult to support the seemingly pointless, yet traumatic visits. This began their attempts to protect the child from the agency and her parents."

A report in the record states: "The Procopios saw Ashley as a very bright, responsive and sensitive child. Mrs. Procopio noted that Ashley

'loved everyone.' She stated that prior to the visits, Ashley was trusting, independent, and swimming in the three foot pool by the age of three. Ashley was also thought to be talented. She was already in dance recitals prior to age three."

On February 19, 1986, while Ashley's mother was purportedly completing a methadone program, her older daughter and son were taken into protective custody, and the mother was charged with child abandonment. Also, there had been other DCP reports on the older daughter and son since Ashley's birth.

In March 1986, Ashley's mother was arrested for prostitution. In 1986, at least 16 appointments for visitation between Ashley and her mother and father were scheduled, but the mother and father saw Ashley on only two of the 16 scheduled appointments. In the entire year of 1986, the mother and father visited Ashley only on January 7, and 11 months later on December 1. At that time, on December 1, 1986, a DCFS worker told Mrs. Procopio "that the case probably would be put in pre-adoption screening by the DCFS."

On December 9, 1986, the circuit court found Ashley's mother to be an unfit parent, and the DCFS received guardianship of Ashley's older sister and brother. On December 11, 1986, Ashley's mother entered an in-patient drug program at Brandon House in Manteno, Illinois.

On January 3, 1987, the DCFS contacted Mrs. Procopio and asked her if she would be willing to take Ashley's older sister and brother into her home as an emergency foster placement. Mrs. Procopio agreed to take them into her home for a weekend. The girl stayed with the Procopios for one week; however, the boy stayed for six weeks. During this foster placement, the girl told Mrs. Procopio a number of horror stories about her childhood. Two of these stories were documented as indicated allegations in the DCFS case notes. Mrs. Procopio testified that on one occasion, the girl stated an incident "where she held a packet of drugs in her mouth during a police raid for her mother." This testimony is not refuted.

As a result of some abnormal behavior by the boy, Mrs. Procopio contacted the LCFS and reported what had occurred. On March 9, 1987, the boy was then placed in the Pediatric Ecology Unit of Mount Sinai Hospital (Mount Sinai) in Chicago. On March 13, 1987, he left Mount Sinai and was placed in a foster home. On April 28, 1987, he was transferred to another foster home through the services of the Jewish Children's Bureau. He joined his older sister at that foster home.

Ashley's mother left the Brandon House in late March 1987, reportedly before completing the drug treatment program. She did, however, then enroll in an outpatient methadone maintenance program at the Garfield Counseling Center (Garfield) in Chicago. Methadone maintenance programs are useful for maintaining the addict so the addict does not commit crimes in order to maintain the addiction. It is, essentially, controlled legal addiction.

As a result of Ashley's mother's enrollment in the Garfield methadone program, at the case review on April 30, 1987, the DCFS instituted twice monthly visits of Ashley by the mother and father, and Ashley therefore did not pass the DCFS pre-adoption screening. The DCFS would not deviate from its uncompromising goal of returning Ashley to her mother and father. At the time of the April 30, 1987, DCFS case review, Ashley was more than three years old and she still had not had a circuit court dispositional hearing and ruling to decide her permanent custodial care, and the DCFS had not petitioned the circuit court for a dispositional hearing to determine her permanent custodial care.

In June 1987, Ashley's mother purchased a house with her mother. Ashley's mother had "money coming to her after her father died in 1984," so she put the money she received toward the purchase of the house. Ashley's mother, her mother, and Ashley's father have lived together in the small four-bedroom house since June 1987. In June 1987, Ashley's father enrolled in the outpatient methadone maintenance program at Garfield. In the history of the case, this was his first entry into any kind of program for drug addicts.

On September 28, 1987, at the request of the DCFS, Ashley was admitted on an in-patient basis to Mount Sinai for a psychological evaluation in order to assess Ashley's severe emotional and behavioral problems related to visitations by her biological mother and father. A Mount Sinai report discusses a meeting that took place between Ashley, her biological mother and father, and the person preparing the report. The report states:

"Ashley broke into tears at the sight of her biological parents and clung to this examiner. She appeared very distressed and her behavior was regressive, for example, she started sucking her thumb and laid on this examiner's lap in a fetal position. *** After a few questions, Ashley broke into tears and ran for the bed. She was crying and repeatedly stated, 'I want my real mommy' referring to her foster mother."

The Mount Sinai report further states:

"RECOMMENDATIONS:

    1. Ashley should return home to her foster parents, Mr. and Mrs. Procopio.

    2. A permanency plan should be implemented so that Ashley could be adopted in the future by the foster parents with whom she has lived since infancy and who she has responded with and knows as her 'real parents.' "

The Mount Sinai report was prepared and signed on October 12, 1987, by Sonia Yballe, M.D., child psychiatrist, and Alan Hirsch, Ph.D., staff psychologist.

Although there was no medical evidence contradicting the findings and recommendations of the child psychiatrist, Sonia Yballe, the recommendations were ignored by the DCFS, and the twice monthly visits between Ashley and her mother and father that were scheduled by the DCFS continued, and Ashley's emotional and behavioral problems continued. As a result, on October 27, 1987, the Cook County public guardian petitioned the court for an injunction and suspension of the visitations by the mother and father.

The public guardian's petition pointed out that Ashley had not received the therapy that the Mount Sinai report said that she needs. On November 10, 1987, the circuit court entered an order which provides: "It appearing that the DCFS having made representation that a therapist will begin treating Ashley within two weeks of date, and that visitation of the parents will be in the context of therapy, it is ordered that the public guardian's motion to withdraw its motion for preliminary injunction is granted."

As a result, in February 1988, with the approval of the DCFS and the circuit court, Ashley's mother and father began weekly visits with Ashley. As to what else Ashley's mother and father were doing at the time, a DCFS placement planning assessment report, dated February 11, 1988, states:

    "Despite the fact that Ashley's mother and father have been together for several years and are working toward the return of both her children and Ashley, they have chosen not to marry. Neither has regular employment although Ashley's father is reported to do side work for cash. Both parents have reportedly stated that they were not ready to pursue regular employment."

The same DCFS placement planning assessment report also states:

    "There is no doubt about the fact that the Procopios have done a beautiful job with Ashley. Not only have they nursed her through her addiction, but they have provided a rich, stimulat-

ing environment for her where, until recently, she was secure and happy."

Nevertheless, in March 1988, in its case review, the DCFS restated its goal of returning custody of Ashley and her older sister and brother to Ashley's mother and father. This was almost four years after Ashley had been placed with the Procopios. Ashley still had not had a circuit court dispositional hearing and ruling to determine her permanent custodial care.

Meanwhile, the visits by the mother and father continued to precipitate behavioral and emotional problems for Ashley, including screaming, tantrums, occasional vomiting on the way to the visits and sleep problems. Mrs. Procopio tried to have the agencies that were already involved with Ashley set up counseling for Ashley, but they did nothing.

As the situation became worse, Mrs. Procopio contacted and made an appointment with the Community Family Services and Mental Health Center of Lyons Township, Illinois (Community Family Services). When the DCFS was told of the appointment, the DCFS caused the appointment to be cancelled because "they were the ones who should be requesting services for Ashley."

A week later, the DCFS gave Mrs. Procopio approval to bring Ashley to the Community Family Services. At the Community Family Services, Ashley was seen and treated by Paul J. Fitzgerald, M.A., R.S.W. He has a master's degree in counseling psychology. He submitted a written report to the DCFS. His report, dated December 8, 1988, states:

"A number of impressions have come out of my work with Ashley, a summary of which will serve to conclude this report.

* * *

3. Ashley clearly sees the Procopios as her family. She and Marge have a good relationship. They, in turn, respond to Ashley in appropriate parental ways. Their loyalty and protectiveness is healthy from the point of view of Ashley's development, but can be problematic in case management if not handled extremely carefully.

4. Ashley is clearly aware of her natural parents as a presence in her life at present, but is unable to understand and/or accept their place in her coming into the world. She does not comprehend that she was taken from them, nor the reasons why, and she does not understand the idea of why they are being considered to have her back. They are, to her, some people that have entered her life. She considers the visits to be a threat because she fears that she will be taken from her home. I have not seen any evidence that her resistance is due to fear or dislike of

them. Neither do I see any evidence that she has been 'coached' to be against them."

On August 9, 1988, the DCFS decided to return Ashley's older sister and brother to the custody of their mother. In the meantime, Ashley's mother was pregnant again, and on October 31, 1988, she delivered a healthy baby boy.

On December 29, 1988, almost five years after Ashley was born, her mother and father filed a petition for supplemental relief requesting that the circuit court vacate the guardianship order of May 8, 1985, and return the custody of Ashley to them. On January 31, 1989, there was a hearing on the petition.

Prior to the January 31, 1989, hearing, Jerry Davis, a caseworker for DCFS, submitted a written report to the circuit court. Davis' report states that Ashley had been having weekly visits with her mother and father, supervised by Davis. It was Davis' impression that the mother and father had not missed a single visit since March 22, 1988. Also, according to Davis, the mother and father were residing in a stable neighborhood, in a four-bedroom home that was owned by Ashley's mother. Davis also stated that the house, on repeated visits, was found to be clean and adequate and that the mother and father's sources of income totaling nearly $550 a month seemed to be adequate. The father had started working as a locksmith. Davis' report also states:

> "It is this worker's professional opinion that the child should be returned home for the following reasons: 1.) The natural parents have completed all tasks required of them by DCFS Client Service Plan. 2.) Natural parents remain drug free. 3.) Natural parents are participating in weekly visitation. 4.) Natural parents are attending counselling. 5.) Natural parents are providing stable and appropriate housing. Natural mother's older children were returned home in August and reunification has proved successful to date. As a result of the above, the original reasons for the child's placement (i.e., neglect and substance abuse) no longer exist."

Although Davis reported that the drug abuse situation was essentially resolved, the records indicate "dirty" urines by Ashley's mother and father "as late as 1988." Also, in contrast to Davis' report, in her December 19, 1988, progress notes, a LCFS caseworker reported that Ashley continued to react with a great deal of difficulty after visits with her mother and father. Reportedly, Ashley would not eat, had sleep problems, was vomiting and defiant. In addition, according to the LCFS report, "while Ashley may have enjoyed her visits with the bio-

logical parents, she still saw her foster parents as her 'emotional' parents."

At the January 31, 1989, hearing, Brenda Massey testified that she is employed by Garfield and that Ashley's mother was her client at Garfield. Massey testified that she has been seeing Ashley's mother since April 1987 because she was a cocaine and heroin addict. Massey testified, however, that Ashley's mother had been drug free as of July 1988.

Dr. L. David Zinn, a board-certified psychiatrist, past president of the Illinois Psychiatric Society, director of the program in adolescent psychiatry at Northwestern Memorial Hospital, also testified at the January 31, 1989, circuit court hearing. He testified that he did psychiatric evaluations of Ashley, her mother and father and her foster parents. He also testified as follows:

"Q. Have your psychiatric evaluations in this case led you to a conclusion about Ashley's well-being?

A. Yes.

Q. What is that conclusion?

A. I believe it is in her best interest to remain in the Procopios' home.

\* \* \*

Q. Now, Doctor, having reviewed the documents that you were provided and having interviewed the child, the foster parent and the biological parent, have you reached an opinion with a degree of certainty as to what would be in Ashley's best interest and what would be the psychological harm of removal at this time?

A. I believe it would have a lifelong detrimental impact to remove her. Again as I have said she perceives Mr. and Mrs. Procopio as mother and father. And she has a sense of her home is their home in Bridgeview. And to be transported somewhere else without any contact with the Procopios would be like a death. The people that she had understood as her parents would have died. And given the importance of relationships at this period of her life, four, five, six, I would venture to say that would have a lifelong consequence in terms of her capacity to relate to people.

It has been my experience working with older children and young adults who have had this happen to them that it continues to haunt them. They have difficulty making a relationship because of the fear that it will always be taken away."

Paul Fitzgerald also testified on January 31, 1989. He had been seeing Ashley since May 1988 at Community Family Services, and he had submitted a December 8, 1988, report to the DCFS. He testified as follows:

"Q. Based on over eight months now, do you feel you know what is in Ashley's best interest?

A. I believe I do.

Q. What is your conclusions?

A. That it would not be in her best interest to be separated from her foster family whom she regards at this point as her real family. That it would be a traumatic event for her."

In addition, at the circuit court hearing on January 31, 1989, the report of proceedings provides that the following occurred:

"Q. What is your name, please?

A. William Davis.

Q. And what is your occupation or profession?

A. I'm supervisor for the Foster Care at the Lutheran Child and Family Services.

Q. Are you familiar with Ashley?

A. Yes, I am.

Q. Calling your attention to immediately after the hearing this morning, did you have a conversation with the biological father?

A. Not exactly.

Q. Did you have any interaction with the biological father?

A. As he passed where Ms. Fuller and I were sitting, he said in our direction, 'Either you are a bunch of sick motherfuckers or you are all sick motherfuckers.' "

The circuit court then stated: "The Department still has its goal to return home. This court is indeed going to cooperate on that basis."

The circuit court then ordered that consideration of the biological mother and father's petition to vacate the guardianship order of May 8, 1985, and to return the custody of Ashley to them be continued to another date. The circuit court also directed the respective parties to develop a plan to move from supervised visitation by Ashley's biological mother and father to unsupervised visitation.

Pursuant to the circuit court's direction, the DCFS requested Anne M. Brown, Ph.D., a psychologist, to interview the parties and to prepare a plan as directed by the circuit court. In addition, the DCFS requested Dr. Zinn, who testified previously on January 31, 1989, to conduct examinations and evaluations of the parties.

On March 30, 1989, Dr. Zinn's affidavit and Anne Brown's plan were presented to the circuit court. Dr. Zinn's affidavit states as follows:

"3. It is my professional opinion that Ashley would suffer grave and irreparable psychological harm if she were to be returned to her biological parents.

4. This harm would be experienced as a death of the only parents she has ever known. Children who suffer this kind of trauma are functionally impaired for the rest of their lives.

5. Ashley may not have the neurological strengths of a fundamentally healthy child due to her history of addiction at birth and will never recover from the emotional pain of separation from the family who raised her.

6. The biological parents have not shown that they have the psychological strengths to adequately raise Ashley.

7. Because the biological parents continue to deny that their actions were the cause of Ashley's coming into foster care, their psychological rehabilitation has not occurred.

8. I treat adolescents impaired because of these kinds of traumas as children and view the possibility of Ashley's removal from her family and return to the biological parents as a disastrous outcome.

\* \* \*

11. Visitation with the biological parents, while the permanency goal for Ashley remains to return her to her biological parents, will continue to cause her grave and irreparable psychological harm."

The essential element of Anne Brown's plan was to have Hephzibah Children's Association (Hephzibah) "conduct an assessment of Ashley's needs," and to let "Hephzibah determine whether the child should be with the Procopios or whether she should go back to her natural family." Hephzibah is a child welfare agency in Oak Park which works together with the DCFS.

Instead of following the advice of Dr. Zinn, the DCFS followed the advice of Anne Brown and arrangements were made by the DCFS to get Hephzibah involved in the case. Hephzibah began its activities in the case on April 3, 1989. They began supervising visitations between Ashley and her biological parents at the Hephzibah facility.

Jerry Okubo, a social worker, coordinated the case for Hephzibah. Okubo reported that Hephzibah's role was defined by the DCFS and was specifically to formulate and implement a plan to determine how

and when Ashley should be returned to her biological mother and father.

It was clear that the continuing stress of the transition took its toll on everyone. Ashley, for one, was admitted to the Palos Community Hospital on May 13, 1989, to be treated for continuous, projectile vomiting, which had started with one of the weekly visits with her biological mother and father. After a two-day hospitalization and evaluations, the doctors found no apparent medical basis for the vomiting.

A report in the record states: "In the midst of the disputes over parental visitation and custody, Ashley lived a relatively common, Chicago neighborhood life. She had a dog of her own (Gizmo) and she had a backyard with a small swimming pool and swing set. She played with many children in the neighborhood and had an active and apparently happy family life with her foster family. She was well-liked by friends and the Procopio family and she seemed to like them in return."

Despite Ashley's well-being and happiness with the Procopios, in June 1989, the DCFS and Hephzibah decided that Ashley should be removed from living with the Procopios and that she should live in the "Hephzibah Shelter as an intermediate step" in order to have a successful "transition of Ashley to her birth parents' home." Anne Brown testified that the decision that was made was not her decision. She testified: "The decision was Hepzibah's decision."

The DCFS decision to remove Ashley from the Procopios' home was presented to the circuit court, and on June 9, 1989, the circuit court entered an order providing that Ashley was to be removed from living with the Procopios, and that she should live in the shelter on an intermediate basis. A schedule that is part of the order provides:

"*1st Phase June 9—July 7, 1989*

(1) Ashley will reside with Marge and Joe Procopio.

*2nd Phase July 7—July 31, 1989*

(1) Ashley will reside at Hepzibah House, Oak Park, Illinois. The foster parents will bring Ashley to Hepzibah House. Ashley and the foster parents will visit at Hepzibah's discretion.

*3rd Phase July 31—September 4, 1989*

Goal: Return home by Labor Day (9-4-89)."

The Procopios objected to the implementation of the circuit court's order, but to no avail. In accordance with the circuit court's order, on July 7, 1989, Ashley was taken by the Procopios to live at the shelter. At the time, Ashley was five years and three months old.

During Ashley's first three weeks at the shelter, the Procopios visited Ashley weekly and they called daily. They tried to pursue an ongoing relationship with Ashley but Jerry Okubo, the social worker at

Hephzibah, considered that "somewhat intrusive" and "a hindrance in developing a relationship with her birth parents." As a result, July 25, 1989, was the designated last visit between Ashley and the Procopios.

A report in the record states:

"During the transition at Hepzibah, the Procopios were told initially that they could call, 'but when we did call, our calls to Ashley were refused...We are made to look like the bad guys.' The Procopios fear that Ashley 'hates us...She thinks we abandoned her, lied to her.' The Procopios are worried Ashley 'had love instilled in her, now there's hate instilled in her.' "

In the meantime, Ashley's biological mother and father continued to visit her at the shelter. As part of Jerry Okubo's plan for this case, he referred Ashley's biological mother and father to Leyden Family Services (Leyden) for family therapy, and they started attending Leyden on August 24, 1989.

On August 29, 1989, there was a circuit court hearing on a progress report of the case. Jerry Okubo testified that Ashley's biological mother and father had been visiting overnight with Ashley as much as four nights a week. In addition, he testified:

"Q. And how is she doing in the shelter?

A. She is doing nicely.

Q. Are there any problems at this time?

A. None.

* * *

Q. And what are you recommending with regards to Ashley today?

A. That D.C.F.S. guardianship be vacated and Ashley to go to the home of the birth parents.

Q. And do you feel there is any risk of harm to the child if she is returned to her natural parents today?

A. No, I do not."

On August 29, 1989, at the conclusion of the hearing, the circuit court vacated its May 8, 1985, order which had appointed the DCFS the guardian of Ashley with right to place. Also, the circuit court entered a dispositional order transferring custody of Ashley to her mother and father pursuant to protective supervision. When the circuit court entered its dispositional order transferring custody of Ashley to her biological mother and father, Ashley had never lived with them and she was five years and four months old.

The August 29, 1989, dispositional order provides:

"IT IS HEREBY ORDERED that case be continued for a period of 12 months pursuant to Ill. Rev. Stat. Ch. 37, Section 2—24 (Juvenile Court Act).

IT IS FURTHER ORDERED that the parties are to observe the following conditions of protection pursuant to Ill. Rev. Stat. Ch. 37, Section 2—24:

1. Mother and Father shall cooperate with all reasonable requests of DCFS or its assigns.

2. Mother and Father shall provide all care necessary for the well-being of the minor.

3. Mother and Father shall abstain from the use of all illegal narcotics.

4. Mother and Father shall attend family therapy at Leyden Mental Health Center.

5. Mother and Father shall ensure that minor attend therapy at Leyden Mental Health Center and shall cooperate with all recommendations and treatment of the therapist(s) including, if judged therapeutically appropriate and in the manner judged appropriate, some contact with foster parents Mr. and Mrs. Procopio."

On September 15, 1989, Mrs. Procopio was seen by Ashley's mother outside of Ashley's school. This happened when Ashley's mother was arriving to pick Ashley up from school. As a result, a confrontation and fight occurred between Ashley's mother and Mrs. Procopio. A report in the record states:

"From the Procopios' perspective, they were very concerned about Ashley. They said they called Hephzibah and had been given no information about how Ashley was functioning and that they had gone to see for themselves how she was doing. As a result, they went to the school to observe if 'Ashley was still smiling.' Ms. Procopio said that when Ashley's mother saw her she 'beat me up; screaming, Bitch! Bitch! Bitch!' When she told the story, Ms. Procopio presented photographs of bruises on her face but did say that she did not press charges because of a promise that there would not be any court action taken as a result of this. However, in a September 22, 1989 action, the circuit court ordered that Mr. and Mrs. Procopio should refrain from any contact with Ashley unless it was approved by Ashley's therapist at Leyden Mental Health Center. As a result, the Procopios tried to maintain contact with Ashley through Leyden. Indeed, Ashley's mother reported that on October 27, 1989, the family therapist at Leyden Family Services received an en-

velope addressed to Ashley from the Procopios. This was apparently one of many attempts to correspond with Ashley that ultimately did not lead to Ashley seeing these letters and cards. The therapist at Leyden returned this and other correspondence to the Procopios unopened."

On September 22, 1989, the circuit court amended its August 29, 1989, order by adding the following:

"AMENDMENT

Mr. and Mrs. Procopio will refrain from any contact with Ashley not approved by the therapist at Leyden Mental Health Center and will refrain from attempting to visit Ashley at either Ashley's school or the biological parents' household."

In late March 1990, Mrs. Procopio asked the circuit court if she and Mr. Procopio could send Ashley a birthday card. The circuit court ordered Ashley's therapist to give the child a birthday card from the Procopios. A report in the record states:

"On April 30, 1990, Jerry Davis, a DCFS worker gave Ashley the Procopio's birthday card in the presence of the therapist at Leyden Family Services. Ashley's mother reported that Mr. Davis brought the card over and that Ashley grabbed it from his hand and asked the mother to read it. The mother refused to do so and turned to Mr. Davis to do the reading. Ashley then picked up the card and started laughing. The mother then said to Ashley that she is not going to have anything to do with the card as she did not want to be responsible for reading any mail which came to Ashley from the Procopios."

On May 31, 1990, there was another circuit court hearing on a progress report. A caseworker for DCFS, Jerry Davis, testified that Ashley's biological mother and father were attending counseling once a week at Leyden. He also testified that "Ashley is adjusting well in the parents' home and at school." In addition, he testified that Ashley's foster parents had sent her a birthday card, but that "she tore the card up."

With respect to Jerry Davis' reference that Ashley was adjusting well, Dr. Zinn testified:

"Q. Dr. Zinn, the reports that you noted indicate that Ashley seems to be adjusting well in her family, now, how would you interpret this report that this year she seems to be adjusting well?

A. Again, as I said, there are hints in the report that she is not adjusting well.

I think when Mr. Davis answered the question about anger and sadness and she says, you know, no, that she doesn't feel those things, again, that's not normal because six-year olds do experience that emotion and normal development or achievement at that point in life is to be able to identify those feelings and to be able to talk about them. So I'm concerned about that."

On May 31, 1990, Jerry Davis also testified that Ashley's therapist at Leyden indicated that she believed that the Procopios should not have any further involvement or interaction with Ashley. The therapist is a licensed social worker who "had been out of school for about a year to a year and a half and had been licensed in Illinois for nine months."

The minimal experience by Ashley's therapist is a telling factor that may account for some of the disparate judgments that were reached in this case. A psychiatrist testified about Ashley's therapist as follows: "To me this view that she had was either somewhat simplistic or incomplete. That may be related to the information that was available to her and may be related to experience. This is a very complicated child with a very complicated situation. It would probably take a fairly well experienced and sophisticated clinician to not only fully appreciate the problem but be able to get to it and treat it." Dr. Zinn, another psychiatrist, testified that Ashley's therapist "should have years of experience working with children" and that "her treatment should be ordered under the supervision of a medical professional with 10 years experience and a board certified child analyst and psychiatrist." Both psychiatrists, and a third psychiatrist, Dr. Sonia Yballe, disagreed with the judgment of Ashley's therapist. No psychiatrist, indeed, no medical doctor, supports the therapist's judgment.

On May 31, 1990, Jerry Davis also testified about Ashley's older sister and brother. Afterward, on May 31, 1990, the circuit court terminated wardship and closed the case as to Ashley's older sister and brother. Custody of Ashley's older sister and brother was returned to Ashley's mother.

A report dated November 5, 1990, states that Ashley's biological mother and father are still not married.. They live together, however, with their two children, the two children from Ashley's mother and her deceased husband, and Ashley's maternal grandmother. The report states that they are living in a small, neatly kept four-bedroom house in a pleasant neighborhood. The report also states that Ashley's father has been employed at a hardware company since about July 1988.

Also, the report indicates that Ashley was doing well in school and socially.

The same report also states:

"In discussing the issue of the many missed visits with Ashley, Ashley's father said that they were often denied access, despite 'how their court records make it sound.' He said some of the sessions they did miss, but often times they were denied access even though the workers wrote that they 'didn't want to see her.' He said there was nothing he could do and 'I have to just go along with the court system.' When asked why he was not more upset by these circumstances, he remarked, 'Well, if you really want to know how I felt, I felt like slapping these people around.' Ashley's father discussed difficulties with other agencies and workers during this case. He felt there were many arguments because people were constantly telling lies to him and Ashley's mother. From Lutheran Child and Family Services, there was 'no real person to trust.' The DCFS workers changed so much that he did not get to know any of them well. He felt they would lie as directed by their supervisors to protect their jobs."

After several other circuit court hearings, on November 28, 1990, the circuit court ordered that Ashley, age six, is precluded from receiving any therapy and that there be no visitation between Ashley and the Procopios. We granted the DCFS's petition for leave to appeal.

There were several errors committed in the circuit court. The first error was perhaps the most significant because it precipitated Ashley into a mess that strains believability. Ashley was placed with the Procopios on June 7, 1984. More than five years later, on August 28, 1989, the circuit court made its first dispositional ruling when it transferred custody of Ashley to her biological mother and father. This was a violation of Federal law. The fact that the circuit court acted either in total ignorance or in total disregard of the Federal law behooves us to expatiate freely on the subject.

In response to the inadequacies in our country's system for child welfare and foster care, in 1980 the Federal government adopted the Adoption Assistance and Child Welfare Act. The Act amended Title IV of the Social Security Act and sought to provide the States with fiscal incentives to encourage a more active and systematic monitoring of children in the foster care system.

■ In particular, the Act amended the Title IV–B program, 42 U.S.C. §§620 through 628 (1988), which provides funds to the States for the improvement of child welfare services, and it created the Title

IV—E program, 42 U.S.C. §§670 through 676 (1988), which provides reimbursement to the States for foster care maintenance and adoption assistance payments made by the States on behalf of eligible children. 42 U.S.C. §§620 through 628 (1988); 42 U.S.C. §§670 through 676 (1988); see *State of Vermont Department of Social & Rehabilitation Services v. United States Department of Health & Human Services* (2d Cir. 1986), 798 F.2d 57, 59.

In amending Title IV—B, Congress authorized annual appropriations of a specified amount for the purpose of establishing, extending and strengthening child welfare services. (42 U.S.C. §620(a) (1988).) Of the specified amount, each State that complies receives a proportional share of the initial part of the specified annual appropriation. For a State to receive its share of any funds appropriated under the Act, the Act provides that the State must certify, *inter alia*, that it has implemented and is operating "a case review system (as defined in section 675(5) of this Title) for each child receiving foster care under the supervision of the State." 42 U.S.C. §627(a)(2)(B) (1988).

■ Section 675(5) of the Act defines "case review system" as follows:

> "(5) The term 'case review system' means a procedure for assuring that—
>
> * * *
>
> (C) with respect to each such child, procedural safeguards will be applied, among other things, to assure each child in foster care under the supervision of the State of a dispositional hearing to be held, in a family or juvenile court or another court (including a tribal court) of competent jurisdiction, or by an administrative body appointed or approved by the court, no later than eighteen months after the original placement (and periodically thereafter during the continuation of foster care), which hearing shall determine the future status of the child (including, but not limited to, whether the child should be returned to the parent, should be continued in foster care for a specified period, should be placed for adoption, or should (because of the child's special needs or circumstances) be continued in foster care on a permanent or long-term basis) * * *." 42 U.S.C. §675(5)(C) (1988).

■ As is evident from the language of the Act, every child that is placed in foster care in a participating State must have a dispositional hearing no later than 18 months after the original placement to determine, among other things, whether the child should be returned to the parents, continue in foster care for a specified period or be placed for

adoption. Illinois has certified that it has implemented and is operating a case review system under the Act and is a participating State under the Act. (Grippando, *Children Cast Adrift: The Failure of the Juvenile Justice System*, CBA Record, November 1990, at 23.) The circuit court of Cook County is therefore required to comply with the Act's provisions.

■ Although one of the purposes of the Act is to provide funding to the States, the central purpose of the legislation is to remove children from long-term foster care, either by uniting them with their parents or by placing them with adoptive parents or in some other permanent arrangement. (*State of Vermont Department of Social & Rehabilitation Services v. United States Department of Health & Human Services*, 798 F.2d at 63.) In introducing the Senate version of the bill in 1979, Senator Cranston made clear the *raison d' etre* for dispositional hearings within 18 months after a child's original foster placement:

> "[T]he provision for a dispositional hearing after a set period of time is, I believe, of critical importance. One of the prime weaknesses of our existing foster care system is that, once a child enters the system and remains in it for even a few months, the child is likely to become 'lost' in the system. Yearly judicial reviews of the child's placement too often become perfunctory exercises with little or no focus upon the difficult question of what the child's future placement should be. Foster care, with few exceptions, should be a temporary placement; unfortunately, under our existing system, temporary foster care becomes a permanent solution for far too many children. This provision requiring a dispositional hearing after a child has been in foster care for a specific period of time should assist states in making the difficult, but critical, decisions regarding a foster child's long-term placement." 125 Cong. Rec. S22684 (daily ed. Aug. 3, 1979).

See also H.R. Rep. No. 136, 96th Cong., 1st Sess. 50 (1979) (remarks of Rep. Ullman).

When one considers the central purpose of the Act, it is plain that the 18-month requirement for a dispositional hearing contemplates a dispositional ruling within a reasonable time thereafter. Also, when one considers the central purpose of the Act it is clear that it is critical for reviewing courts in Illinois to make certain that the time requirements for a dispositional hearing and ruling be complied with in individual cases.

In Illinois, the sad consequences of not giving each child placed in foster care his or her entitlement to a dispositional hearing within 18

months of the child's original placement, and a dispositional ruling within a reasonable time thereafter, are aptly demonstrated in Grippando, *Children Cast Adrift: The Failure of the Juvenile Justice System,* CBA Record, November 1990, at 23:

"It was not until May 1990 that the court began to make permanency determinations. Two judges, each on a half-time basis, were given the responsibility of reviewing the 12,000 cases on the guardianship calendar. Where the parties are unable to agree on a permanency plan, the case is sent to one of the six (already inundated) geographic calendars. No more than 200 have received permanency determinations.

On August 1, 1990, 652 of the 12,000 cases were pending before two judges. During that month, they continued 355 of these cases. Clearly, it is not possible for these judges to handle this task.

Thousands of children in Chicago have been in foster care for several years without any attempt to terminate parental rights so that the child could be adopted. In some cases, parental rights should not be terminated because adoption would be improbable. In others, adoption may not be in the child's best interests because of strong family ties.

In many cases, however, the natural parents have shown little or no interest in the child and adoption is likely with potential adoptive parents standing in the wings. Yet, DCFS and the State's Attorney make no attempt to even file a petition to terminate parental rights. Why?

Under our current procedure, an individual DCFS worker plays an important role in determining when a petition should be filed. We have provided that worker no incentive to make that determination. As long as a worker lists a permanency goal as 'return home' and the parents are uncooperative, the DCFS caseworker has little to do on that case. The paperwork related to termination of parental rights, however, is extremely burdensome. That burden is placed on the worker, who has been assigned three times the cases that the worker can reasonably be expected to handle. The course of least resistance is simply to list 'return home' as the child's permanency goal. These permanency determinations are important, especially for younger children. Few people wish to adopt pre-teens and teenagers.

Under the current procedure, the court will only be able to make permanency determinations in a small percentage of cases, and will remain out of compliance with federal law."

■ In the present case, the circuit court's August 29, 1989, dispositional order transferring Ashley's custody to her biological mother and father was made five years and four months after Ashley's original placement. This dispositional ruling was clearly not made within any reasonable time after a dispositional hearing as required under the Act. The circuit court therefore erred in not complying with the Federal law.

The fact that the Federal law was not complied with in this case is not an insignificant factor in Ashley's life. Rather, it is the center of the cause of the anguish that now encircles her life. If there had been a dispositional hearing in December 1985 (18 months after Ashley's placement) and a dispositional ruling within a reasonable time thereafter, a permanent decision would have been made for her future at a time which would have avoided the turmoil and problems she has suffered and may suffer the rest of her life.

What happened to Ashley as a result of the circuit court's total ignorance or total disregard of the Federal law is shocking. Ashley's story is the account of a helpless child caught in the quagmire of the bureaucratic maze which we mistakingly call our child welfare system. Unfortunately, the judicial system did not respond to her plight. Instead, it became part of the quagmire, adding to Ashley's misfortune.

There is no doubt that the DCFS and our juvenile court system are abysmal failures. There are reports that almost as many children are harmed as are benefitted by coming under their common aegis. (See Grippando, *Children Cast Adrift: The Failure Of The Juvenile Justice System*, CBA Record, November 1990, at 16; Abraham, *Juvenile Court, DCFS Violate Law, Leave Children in Limbo*, Chicago Reporter, February 1991, at 3; *B.H., et al. v. Gordon Johnson* (N.D. Ill. June 29, 1988), No. 88—C—5599;[1] *Dana W., et al. v. Gordon Johnson*

---

[1] In *B.H., et al. v. Gordon Johnson*, a final consolidated report of Rule 706 panel of experts was filed. Some findings about the DCFS and our juvenile court system that are contained in the report are revealing: (1) "It is the consensus of the panel that the risk to these children's health, development and well-being is not significantly diminished, and is many times aggravated while in DCFS custody. The children remain high risk until they are finally pushed from or exit the system"; (2) "There is no operative case management or meaningful administrative case review. Cases are unattended and unassigned. Caseload levels are unmanageable. There is no assignment of responsibility or clear delegation of authority for decisions affecting the child"; and (3) "The assessment of the individual needs of the child and the family, and a linkage to appropriate services is not enhanced by the role of the court in juvenile court and pre-adoption proceedings. The courts are overcrowded, understaffed and rarely provide meaningful review of children in custody."

(N.D. Ill. June 18, 1990), No. 90—C—3479.) Every effort must be made, however, to see that what happened to Ashley never happens to another child in Illinois. All other considerations aside, and there are many, humaneness and plain common sense make it imperative that there be proper judicial case management in child custody cases in Cook County, and that there be a sufficient number of judges to cope with the number of cases in the system. There must be a systemic vigilant awareness that in our socio-legal priorities, child abuse, neglect and custody cases rank at the top.

■ We next review the orders entered on August 29, 1989, and November 28, 1990. The propriety of the latter order is plainly dependent on the propriety of the former, so that both orders require review for us to determine the order or judgment that ought to have been given or made and to grant the relief that the case may require. (134 Ill. 2d R. 366.) Also, an appeal "brings up the whole record," and on appeal all interlocutory orders in the record may be considered by the reviewing court in order to grant the relief that the case may require. (See *Biagi v. O'Connor* (1959), 18 Ill. 2d 238, 241, 163 N.E.2d 461, 463; 134 Ill. 2d R. 366.) These principles are especially applicable and clearly warrant application in a child custody matter such as the present case.

The August 29, 1989, circuit court order vacated the appointment of the DCFS as guardian of Ashley and transferred custody of Ashley to her biological mother and father. The salient facts at that time are as follows:

(1) Ashley was five years and four months old.

(2) Ashley had lived with the Procopios as her *de facto* parents virtually all of her life in a home environment that was stable, loving and caring.

(3) A report in the record states: "There is no doubt about the fact that the Procopios have done a beautiful job with Ashley. Not only have they nursed her through her addiction, but they have provided a rich, stimulating environment for her where, until recently, she was secure and happy."

(4) In her entire lifetime, Ashley had never lived with her biological mother and father, and she had never spent an entire week with them.

(5) Ashley's biological mother was a heroin and cocaine addict during the time that she was pregnant with Ashley, and Ashley's biological father was also a drug addict at the time.

(6) As a result of her biological mother's drug addiction during pregnancy, Ashley was born with withdrawal and tremors from heroin and cocaine.

(7) Ashley's biological mother was prostituting during the time she was pregnant with Ashley.

(8) While Ashley's biological mother and father were living together, Ashley's biological mother was using prostitution to support herself, a daughter, son and Ashley's biological father. She was engaged in prostitution while Ashley's father was at home with her daughter and son.

(9) Ashley's biological mother had a criminal conviction for child neglect involving Ashley's sister.

(10) While Ashley's biological mother and father were living together, they were spending $300 per day on drugs while they were not working because they were just "too sick."

(11) During Ashley's lifetime, Ashley's biological mother had a conviction for forgery; Ashley's biological father also had a conviction for forgery.

(12) On May 3, 1984, the circuit court adjudged that Ashley was a neglected and dependent minor.

(13) During the first 16 months of Ashley's life, she was visited by her biological mother three times and twice by her biological father.

(14) On May 5, 1985, the circuit court adjudged that Ashley's biological mother and father were unfit parents.

(15) Although Ashley's biological mother and father were allowed visitation with Ashley in 1985, they saw her on only seven occasions for the entire year because, according to Ashley's biological mother, "it was hard for her to be with Ashley at this time as she was often sick from drugs."

(16) Ashley's biological mother was arrested for prostitution on May 15, 1984; arrested for prostitution on June 25, 1984; arrested for possession of stolen property on May 29, 1984; arrested for possession of stolen property on August 28, 1984; arrested for prostitution on November 13, 1984; and arrested for prostitution in March 1986.

(17) In the entire year of 1986, Ashley's biological mother and father visited her only on January 7, and 11 months later on December 1.

(18) On February 18, 1986, Ashley's older sister and brother were taken into protective custody and Ashley's biological mother was charged with abandonment.

(19) On December 9, 1986, the circuit court adjudged Ashley's biological mother to be an unfit parent and the DCFS received guardianship of Ashley's older sister and brother. In 1986, Ash-

ley's older sister and brother were placed in a foster home because Ashley's biological mother was unfit as a parent.

(20) On September 28, 1987, Sonia Yballe, M.D., child psychiatrist at Mount Sinai Hospital, evaluated Ashley and filed a report on October 12, 1987, which states: "Recommendation: (1) Ashley should return home to her foster parents, Mr. and Mrs. Procopio."

(21) There is unrefuted testimony that while she was living with Ashley's mother and father, Ashley's sister was made to hold "a packet of drugs in her mouth during a police raid for her mother."

(22) Ashley's biological mother and father had intermittent "dirty" urine from drugs as late as 1988.

(23) Ashley's biological mother and father filed their petition to have custody of Ashley transferred to them for the first time on December 29, 1988, almost five years after Ashley was born.

(24) Paul Fitzgerald, a psychologist, treated Ashley for eight months and testified as follows on January 31, 1989: "It would not be in her best interest to be separated from her foster family whom she regards at this point as her real family. It would be a traumatic event for her. It is the one thing she seems to fear the most which is provoking a great deal of anxiety at this point."

(25) On January 31, 1989, Dr. David Zinn, a psychiatrist and director of the program in Adolescent Psychiatry at Northwestern Memorial Hospital, testified: "I believe it is in Ashley's best interest to remain in the Procopios' home."

(26) On March 30, 1989, Dr. Zinn signed an affidavit which states: "It is my professional opinion that Ashley would suffer grave and irreparable psychological harm if she would be returned home to her biological parents; the biological parents have not shown that they have the psychological strengths to adequately raise Ashley; because the biological parents continue to deny that their actions were the cause of Ashley's coming into foster care, and psychological rehabilitation has not occurred; and I treat adolescents impaired because of these kinds of trauma as children, and view the possibility of Ashley's removal from her family and return to the biological parents as a disastrous outcome."

(27) There was no testimony or report of any kind from a psychiatrist or from any other medical doctor to contradict the conclusions and recommendations of the two psychiatrists, Yballe and Zinn. Nor was there any testimony or report from any psy-

chologist to contradict the conclusions and recommendations of Paul Fitzgerald.

(28) Ashley's biological mother and father had literally never nurtured, trained, or had anything whatsoever to do with Ashley's education or upbringing for the first five years of Ashley's life.

(29) Ashley's biological mother and father were not married and did not contemplate marriage.

The above facts are to be weighed against the following facts:

(1) Gerry Davis, a social worker for DCFS, testified on January 31, 1989, as follows:

"Q. Mr. Davis, I am going to direct your attention to the DCFS service plan that was set up for my client. In that service plan, have the natural parents completed all the tasks required by your agency?

A. Yes.

Q. And in so doing, have they remained drug free to your knowledge?

A. Yes.

* * *

Q. And do you feel that the original reason for this placement of Ashley, neglect and substance abuse, are still existing?

A. I believe that they are no longer existing."

(2) Brenda Massey, who has a bachelor of science degree and is employed by the Garfield Counseling Center, testified on January 31, 1989, that Ashley's mother has "a 10-year history of substance abuse," and that she believed that "the first time Ashley's mother has been really free of drugs" was "as of July 1988, when she became drug free." Brenda Massey also testified:

"Q. And do you think that at this time the mother would be ready, willing and able to assume control of Ashley?

A. Yes, I think so."

(3) Jerry Okubo, who is employed as a social worker for Hephzibah, testified on January 31, 1989, as follows:

"Q. And what are you recommending with regards to Ashley today?

A. That D.C.F.S. guardianship be vacated and Ashley to go to the home of the birth parents.

Q. And did you feel there is any risk of harm to the child if she is returned to her natural parents today?

A. No, I do not."

We fail to see how the facts taken as a whole could possibly be construed to favor transferring the custody of Ashley to her biological mother and father on August 29, 1989. When the facts are construed in favor of the biological mother and father, at best they merely demonstrate that although they have had a 10-year history of drug abuse, repeated prostitution, child neglect, child abandonment, forgery convictions, adjudications of being unfit parents and other anti-social behavior, they had stopped using drugs for about 13 months, from July 1988 to August 29, 1989, and that they had completed a DCFS service plan within that same 13-month time frame. Moreover, they are still not married.

With respect to the nondrug use for the 13-month period, the time frame is negligible when one considers the high rate of recidivism for heroin and cocaine addicts and the kind of risk that is involved in putting a child of Ashley's age in the environment that drug addiction breeds. This is especially true when we consider that Ashley's biological mother and father had a drug habit that cost them $300 per day while neither of them was working, and that the drugs involved were both heroin and cocaine. A report in the record states that while any kind of drug addiction is awful, of all the drugs, "heroin is probably the worst." Moreover, we must bear in mind that Ashley's mother has a 10-year history of heroin drug addiction that is coupled with inveterate prostitution and criminality.

In addition, the record demonstrates that in reaching their conclusions the DCFS, Hephzibah and the circuit court narrowly focused on whether in the last 13 months the biological parents finally began to show an interest in Ashley's well-being and whether they had stopped using drugs during that 13-month period, rather than on the best interest of Ashley.

The DCFS and Hephzibah were working closely together and using the same guidelines. The DCFS rules "to explain the philosophy, standards, and guidelines around which the Department centers its planning and decision-making for children and families" state: "Evaluating Whether Children in Placement Should Be Returned Home—(a) When deciding whether children in placement should be returned home to their parent's care, the Department shall consider whether the parents show an interest in the children's well-being." (89 Ill. Adm. Code §§305.1, 305.8 (1985).) This DCFS rule for evaluating whether children in placement should be returned home makes no mention or reference that "the Department shall consider" the best interest of the child. If it is not in the best interest of the child in placement to return home, however, it makes no difference whether the parents show an interest in the

child's well-being. The DCFS rule for evaluating whether children in placement should be returned home is therefore misfocused.

■ Upon a petition for restoration of a minor to the custody of the parents the issue that singly must be decided is the best interest of the child. (*In re Ice* (1976), 35 Ill. App. 3d 783, 784, 342 N.E.2d 460, 462.) Indeed, this is true in all guardianship and custody cases. (*In re Violetta B.* (1991), 210 Ill. App. 3d 521, 533.) It appears that the circuit court in the present case, however, may have attempted to balance the best interest of Ashley with the so-called "rights" of the biological mother and father. At one point when the court was considering the biological parents' petition to regain custody of Ashley, the circuit court stated:

> "I agree that Ashley has rights. I agree that what the best of Ashley is must indeed prevail [*sic*]. But I also believe that the parents have rights. And that the parents' rights should interplay in this decision.
>
> And somewhere, somehow, we have to try to strike a balance between the best interest of the minor and indeed the parental rights."

■ The circuit court was wrong. A child's best interest is not part of an equation. It is not to be balanced against any other interest. In custody cases, a child's best interest is and must remain inviolate and impregnable from all other factors, including the interests of the biological parents. This lapidary principle in the law is aptly demonstrated in *Violetta*. In *Violetta*, the court stated:

> "The best interest of the child takes precedence over even a natural parent's superior right to custody of his child. Section 1—2(3)(c) of the Juvenile Court Act specifically states that '[t]he parents' right to the custody of their child shall not prevail when the court determines that it is contrary to the best interests of the child.' (Ill. Rev. Stat. 1989, ch. 37, par. 801—2(3)(c).) As stated in *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 209, 247 N.E.2d 417, 421, '[t]he best interest of the child is the standard and it is not necessary that the natural parent be found unfit or be found to have legally forfeited his rights to custody, if it is in the best interest of the child that he be placed in the custody of someone other than the natural parent.' It follows then that if the best interest of the child conflicts with the statutory preference for placement with a close relative, the best interest of the child should control the placement decision." *In re Violetta B.* (1991), 210 Ill. App. 3d 521, 533.

■ In the present case, we conclude that on August 29, 1989, the facts leave no doubt that it was not in the best interest of Ashley to

transfer her custody to her biological mother and father. The August 29, 1989, circuit court order transferring custody of Ashley to her biological mother and father is palpably against the manifest weight of the evidence and an abuse of discretion, and must be reversed.

We next address the order entered by the court on November 28, 1990, and the orders leading up to its entry. In July of 1990, the DCFS and the Governor of Illinois filed petitions to require that Ashley and her biological mother and father see an independent psychiatrist for psychiatric examinations and evaluations. Also, in July 1990, Ashley's biological mother and father filed a petition to terminate the protective supervision provisions in the August 29, 1989, circuit court order that transferred custody of Ashley to them, and to "close the case." A hearing was had on all three petitions on July 25, 1990.

At the hearing on July 25, 1990, Dr. Zinn testified as follows:

"A. Well, I believe that there have been several significant interferences in her development and as a consequence, I believe those interferences put her at risk.

First of all, I believe that she is biologically vulnerable given the circumstances of her birth and the nature of her first few months of life.

I think she's at high risk for furtherance of that, essentially, biological stress.

\* \* \*

Q. Would it be fair to say that the events of the last several years of which you are aware had put her at risk?

\* \* \*

A. I believe there continues to be tension—continuing tension around what is the best course to pursue with Ashley and, specifically, the issue about continuing evaluation, continuing help for her and that is contained in the records where there indeed seems to be on the one hand an extraordinary concern on the part of Ashley's biological mother and father for their privacy and their wish to be relieved of any further supervision or observation, you know, which at one level one can appreciate.

On the other hand, I think in Ashley's best interest, clearly some continuing observation is in order given what I see to be the nature of the risk with her.

\* \* \*

I think that there will be continuing areas of risk around school, around performance in the normal activities of seven, eight, nine, ten year olds, possibly derivative from a variety of different things.

I think she's probably at risk for learning disorders and, possibly, attention difficulties given the nature of her birth and her medical situation early in life. I think that—I would be concerned about what may be going on in the family at this point in the extent to which family issues might be of impact on her.

* * *

A. I'm referring to her being born drug dependent and showing signs of that drug dependency."

Dr. Zinn then testified:

"Q. Doctor, over the last year, in terms of the therapy Ashley's been receiving at Leyden, if you knew that Ashley, with the exception of a birthday card has had no contact with the foster parents, would, based on your experience and education, would you consider that to be appropriate or inappropriate?

A. I think it's a terrible tragedy. I think the way that the separation from the foster parents occurred, the continuing isolation from what I can tell in these records, the extent to focus the Procopios as the bad ones, to isolate Ashley from her first four years I think is a tragedy and is just an awful thing.

Q. And how could her therapy be conducted differently to take care of that problem?

A. Well, again, as I said, I think in the records there's no indication that there is any overall supervision of all the different aspects, clinical aspects, which come up with Ashley.

The records that I read focus rather narrowly on the relationship issue and, again, as I said, I think leave out the issue of the rage she has to feel given everything that's happened to her. * * *

* * *

A. Based on the reports that I've seen, I think she's under extraordinary stress.

* * *

Q. In your opinion would an approach that would view the assimilation of Ashley to her family now and would bar discussion of her former family be inappropriate?

A. Yes, I do believe."

The next witness to testify at the July 25, 1990, hearing was Dr. Bennett Leventhal, who is a board-certified psychiatrist and a faculty member at the University of Chicago, where he teaches Child and Adolescent Psychology. He is also board certified in child adolescent psychiatry. He reviewed all of the relevant records pertaining to Ashley's history and case. He testified:

"Q. Doctor, based upon your review of those records, do you have an opinion or an assessment as to whether or not Ashley may be a child at risk?

A. Yes, ma'am.

Q. What is that opinion?

A. She clearly is a child at risk.

Q. And what would be your assessment of the degree of risk at which she's at?

A. Quite substantial.

Q. And would you please tell us why you feel her to be a child at high risk?

A. Well, it's fairly well established that she has been exposed to a number of events which, according to research and clinical practice would indicate that the child has substantial probability of developing problems, either develop them currently or later and those risk factors would include beginning from the time of birth, the dependence on narcotics at the time of birth, the early separation from her parents, the subsequent separation from long standing caretakers, someone who had apparently become their primary caretaker and then, thirdly, the mechanism by which she was transferred from her foster parents back to her biological parents. All of those factors—one of these alone, indeed, would put a child at serious risk for developing serious psychological problems.

The last is, of course, that she has biological parents who have had problems of their own which puts her presumably at some risk for developing later problems.

Q. And, sir, would you please explain to the Court what you mean when you say problems, that she might develop problems, what are you referring to?

A. Well, the scientific literature would suggest that she's at great risk for developing a psychiatric illness at some point during childhood or early adulthood.

\* \* \*

Q. Doctor, what, if any opinion, do you have as to how the therapist has handled the foster parents?

\*\*\*

A. Well, it would appear from the record that the therapist hasn't really dealt with the foster parents at all and that is in my view, a terrible mistake for two reasons.

Number one, the foster parents are an inherent part of this child's life whether we like it or not and to help this child manage

that relationship and, furthermore, to help the foster parents and her biological parents manage that relationship is absolutely essential and would appear, at least for the records that I've seen, that that's been neglected.

\* \* \*

Q. Dr. Leventhal, would you regard Ashley's case as one of being complicated?

A. Yes, ma'am.

\* \* \*

THE COURT: Did you, as part of the materials that you have received from the DCFS did you see the transition plan that was developed by Dr. Brown and did you see any reports from Hephzibah?

THE WITNESS: Yes, sir.

THE COURT: And you still reached that conclusion?

THE WITNESS: Absolutely, yes, sir."

The next witness to testify was Jerry Davis, who is a caseworker for the DCFS. He has been assigned to manage Ashley's case since October 1988. He testified:

"A. The issue has been raised that the child is at risk for emotional harm. There is testimony from Dr. Zinn from before she was returned home predicting that she would suffer irreparable harm if she were returned home. She has been seeing a therapist. The therapist has indicated that she is resolving the issue of assimilating with the family. There is some question about whether there are emotional issues that are going on that are not resolved.

Q. Okay. Sir, how and when was the issue raised that the child was at risk?

A. The issue was raised originally by Dr. Zinn and had been indicated by some of the conversations that I have had with the child in which she has denied feelings that we would expect a six-year old child to be experiencing. In particular, I spoke with her in February of this year at her school and asked her who Marge and Joe were. She denied knowing the Procopios. She denied remembering anything about them. I spoke with her and—on the 17th of this month and, again, asked her specifically what circumstances—under what circumstances does she get angry. She said she does not.

I questioned her further on that point to clarify that she was saying that she never, ever, gets angry.

* * *

Q. And your conversation in February was troublesome to you?

A. The conversation in February suggested that she was denying any knowledge of the foster family."

At the conclusion of the July 25, 1990, hearing, the court ordered that Ashley, her biological mother and father and the Procopios be submitted for psychiatric examinations by Dr. Leventhal at the University of Chicago, and the case was continued.

Dr. Leventhal then worked with a team of specialized professionals at the University of Chicago for approximately four months, examining and evaluating all of the parties and the psychiatric and psychological problems presented by the facts in this case. Dr. Leventhal then submitted a lengthy detailed report to the circuit court, in which he recommended a comprehensive treatment plan for Ashley. Dr. Leventhal recommended that Ashley have continued psychiatric and psychological examinations, therapy and care, and periodic reassessments of her development. Dr. Leventhal also recommended in his report that it would be in Ashley's best interest to have visitations with the Procopios.

The case was then set for hearings on November 13 and November 28, 1990. Only two people testified at the hearings. Dr. Leventhal was called as a witness by the DCFS, and Anne Brown was called as a witness on behalf of the biological mother and father.

Dr. Leventhal testified on November 13, 1990, as follows:

"Q. Doctor, during the course of the examination I know your report reflects that you interviewed a number of people. Can you tell me whether you made any specific findings about Ashley's emotional well-being deriving from the fact that she was transferred from one home to another?

A. Yes, ma'am.

Q. And what are those?

A. Well, we believe—I believe that Ashley suffered some adverse consequences as a result of this transfer.

* * *

Q. Sir, based on your examination do you have an opinion as to the best interest of Ashley in terms of therapy needs?

A. Yes, ma'am.

Q. What is that opinion?

A. Well, Ashley is still somewhat confused, sad and having problems related to the separations that she's experienced, not just in terms of the loss of her foster parents, but the movement from her home and also the strong and intense antagonism that

exists between the people that are so important in her life, namely her biological parents, and Mr. and Mrs. Procopio.

There is no current mechanism available for her to be able to remove those conflicts. In addition to which she's been left with the sense of insecurity and lack of self assuredness in terms of her own safety and protection because a variety of people have failed to protect her to the extent that she should have been as a child.

Q. Therefore in your opinion what sort of therapy needs will she have in the future?

A. Well, in the immediate present she needs to spend some time getting some sense of the impact of this on her and what the results of those events have been on her life so that she can begin to understand what it means, if you will, internally to her.

In addition to which she has to come to some understanding about why the various adults have done what they've done. And so that she can integrate that and develop some new sense of herself and sense of self confidence.

Q. Would those needs be met through individual psychotherapy for Ashley?

A. Yes, ma'am.

Q. What, if any, opinion do you have regarding the adequacy of Ashley's current therapist?

A. Based on the material which I reviewed, and I did not speak to her, so I can't comment on that directly, but based on the material which I've reviewed it would appear to me this view that she had was either somewhat simplistic or incomplete. That may be related to the information that was available to her and may be related to experience.

This is a very complicated child with a very complicated situation. It would probably take a fairly well experienced and sophisticated clinician to not only fully appreciate the problem, but be able to get to it and treat it.

Q. Are you then indicating that someone else possibly should be the therapist?

A. I think that is probably a distinct possibility."

Dr. Leventhal was then asked whether there should be visitation between Ashley and the Procopios. He gave the following answer:

"Q. Do you have an opinion as to whether visitation between Ashley and the Procopios would be in her best interest?

A. Yes, ma'am.

Q. And your opinion is?

A. Absolutely yes."

Dr. Leventhal was then asked about the need for continuing reassessment of Ashley's development. He testified as follows:

"Q. Sir, you made some findings regarding the continuing need for a reassessment for Ashley. Would you explain to the court what those findings are and what your recommendations are?

A. Yes, ma'am. None of us can predict the future with any certainty and it's hard to tell, given that this child is at enormous risk for a variety of problems, what may develop in the future. We know what exists in the present, what those risks are. Only if we carefully monitor the evolution of her development will we get a real sense of new problems developing.

In addition to which we don't know what new experiences will face her and how those will interact with the givens that she has at the present time.

Therefore, we will suggest that she be re-evaluated on a regular basis to make sure that the interventions which we proposed are working and that if new problems arise that the interventions for those are incorporated into her treatment plan.

Q. Sir, you made some specific findings regarding her educational progress and the need for reassessment. Would you explain to the court what you found, what your recommendations are?

A. There are two issues. Number one, although Ashley seems to be doing generally satisfactorily in school, there are some hints on the testing that we did that as the cognitive tasks become more complex she may have more difficulty.

While it's not entirely clear what specific handicaps may derive from intrauterine exposure to narcotics, it's clear there may be some early indications that some of those problems may develop or may be in the early stage of developing.

If we catch those early as they do develop and adjust the educational program for her accordingly, we will probably be able to minimize, if not completely obviate the problem that develops."

When Dr. Leventhal was asked on cross-examination as to visitations between Ashley and the Procopios, he testified as follows:

"Q. You've indicated ever clearly that you think it's absolute that Ashley should have visits with the Procopios. Have you considered what consequences there are to continued involvement with her ex-foster parents?

A. What adverse consequences?

Q. Yes.

A. Well, I think the—yes ma'am, I have. And the fundamental adverse consequences are really related not to Ashley's relationship with the Procopios or her parents directly, but rather the enmity that exists between the biological mother and father and the Procopios. And if the adults can manage that reasonably effectively it will pose relatively little adverse consequences to Ashley and has far more benefits than potential adverse consequences.

\* \* \*

Q. Now, Doctor Leventhal, you recommend visitation between Ashley and the Procopios, okay. What is the clinical data on which you base that recommendation.

A. There are several issues here. \*\*\*

In addition to which the child is very well aware that the Procopios are alive and in existence somewhere, not terribly far from her. And she desires to see them.

Q. How do you know that?

A. From a variety of prospectives [sic], most importantly from her own—

Q. Okay. Let's take one by one, how do you reach that conclusion that she wants to see the Procopios, just please tell me.

A. Let me cut right through it and be clear that in her discussions with us it was very clear, number one, that she thinks about the Procopios.

\* \* \*

Secondly, the school, when we were there, for example, one of the teachers said it was clear that there was someone missing from this kid's life, which is true. And the child felt uncomfortable dealing with it. And most importantly, Ashley expressed that to us implicitly and explicitly."

On November 28, 1990, Anne Brown testified on behalf of the biological parents as follows:

"Q. Based on your expertise regarding managing visitation, based on your knowledge of this particular case; do you have an opinion regarding whether or not it is in fact in the best interest of Ashley for the court to require visits either at the present time or in the future with the former foster parents over the objection of her mother and father?

A. It is my opinion that that would be actively harmful to the child.

Q. In what ways or why do you believe it would be actively harmful to the child?

A. What it does is absolutely undermine the child's ability to safely live and confidently become a full fledged member of her family, to be able to trust that her parents can protect her and to be able to hope that some day she can stop being the cause of all this turmoil, that she's like the lightning rod that's attracting all this craziness.

* * *

Q. With respect to that portion of Dr. Leventhal's report which recommends that Ashley be in psychotherapy, in your opinion what are the present therapy needs of the minor, Ashley?

A. I think the most pressing need is relief from intrusion and harassment. I think the most pressing need is privacy and support, for the privacy of her family to give her a chance to settle in without constantly being threatened that her life is going to be switched on her again.

In terms of future needs, there is a tendency on the part of child therapists to think that all children need therapy.

I'm a child therapist, and I think that's not true. I think children actually did fine before child therapy became a profession.

* * *

Q. When was the last time you saw Ashley?

A. The last time I saw Ashley was I believe in January of 1988.

* * *

Q. You just stated that Dr. Leventhal's report is confusing, and you disagree with his recommendations; is that correct?

A. Yes."

At the conclusion of Anne Brown's testimony on November 28, 1990, the circuit court announced its order that Ashley is precluded from receiving any therapy, and that there be no visitation between Ashley and the Procopios. The circuit court stated: "I think that she has been over therapied." In making its ruling, the circuit court totally rejected the recommendations of Dr. Leventhal and Dr. Zinn, and accepted the recommendations of Anne Brown.

The circuit court's order cannot withstand scrutiny. The testimony of two eminently qualified psychiatrists clearly and convincingly establishes that Ashley is a very complicated child under extraordinary stress, and at high risk to developing complex biological, educational, psychological and psychiatric problems in her childhood.

In addition, Dr. Leventhal testified that Ashley needs continuing psychotherapy and that her development must be reevaluated on a regular basis "to make sure that the interventions which we propose are

working and that if new problems arise that the interventions for those are incorporated into her treatment plan." Specifically, as to the problem of Ashley's intrauterine exposure to narcotics, Dr. Leventhal testified that some of the specific handicaps derived from such exposure "may develop or may be in the early stage of developing," and that if "we catch those early as they do develop," then "we will probably be able to minimize, if not completely obviate, the problems that may otherwise develop."

Dr. Leventhal also testified that it would "absolutely" be in Ashley's best interest to have visitations with the Procopios. Dr. Zinn testified that if there are no such visitations it would be a "terrible tragedy."

Significantly, there is absolutely no medical testimony anywhere in the record to contradict the testimony and recommendations of Dr. Leventhal and Dr. Zinn, or Dr. Leventhal's comprehensive medical report that was submitted to the trial court. The only testimony in the entire record that is in disagreement with the diagnosis, prognosis and recommendations of Dr. Leventhal and Dr. Zinn is the nonmedical testimony from Anne Brown and Ashley's therapist at Leyden.[2] Moreover, when Anne Brown gave her testimony on November 28, 1990, she had not seen or spoken to Ashley for almost three years, and she had not submitted a written report. Instead, she merely read Dr. Leventhal's report, and her testimony is that "Doctor Leventhal's report is confusing."

In the first instance, Anne Brown's testimony lacks credibility. Her recommendations to deny therapy to a six-year-old child with Ashley's history and to deny Ashley visitation with the people who were her *de facto* parents for the first five years of her life defy sound practical judgment that is independent of specialized knowledge or training. We also note that this is not the first case where Anne Brown's forensic credibility has been questioned. We take judicial notice that on another occasion, a court has "cast doubt upon her conclusions," and held that her testimony was "questionable" because it was based upon a test that she was too "inexperienced" to administer. *In re Marriage of L.R.* (1990), 202 Ill. App. 3d 69, 83, 559 N.E.2d 779, 788.

---

[2]Dr. Leventhal has been an M.D. for 16 years and board certified in child adolescent psychiatry for 10 years. Dr. Zinn has been an M.D. for 20 years and board certified in child psychiatry for 13 years. As a comparison, Anne Brown was not registered and licensed as a psychologist in Illinois until May of 1987, about 3½ years before she testified on November 28, 1990. Ashley's therapist at Leyden has been out of school for about a year and a half and has been licensed in Illinois for about nine months.

As a matter of evidence, Anne Brown is not a medical doctor and therefore does not have the credentials to competently assess or confute the medical testimony of Dr. Leventhal or Dr. Zinn, or the medical report of Dr. Leventhal. Expert medical testimony and medical evidence are by their nature too recondite to be refuted by nonmedical testimony. This is especially true in a case involving medical testimony from psychiatrists about a child's prognosis and well-being.

It follows that to the extent Anne Brown's testimony may be contrary to the expert medical testimony of Dr. Leventhal and Dr. Zinn, her testimony has no bearing. Likewise, the testimony of Ashley's therapist at Leyden has no bearing. Simply put, there was no competent testimony to contradict the testimony of Dr. Leventhal and Dr. Zinn.

It is therefore plain that the circuit court erred. The circuit court cannot disregard expert medical testimony that is not countervailed by other competent medical testimony or medical evidence. Moreover, the circuit court, itself, cannot second-guess medical experts. If the circuit court does not follow medical evidence that is not refuted by other medical evidence, the circuit court is acting contrary to the evidence. That is what happened here.

Under the circumstances, the November 28, 1990, order of the circuit court that Ashley not receive any therapy and that there be no visitation between Ashley and the Procopios is against the manifest weight of the evidence and was an abuse of discretion. In addition, we conclude that the recommendation of Dr. Leventhal that Ashley receive therapy, medical examinations, evaluations and treatment must be implemented. We also conclude that the recommendation of Dr. Leventhal that there be visitations between Ashley and the Procopios must be implemented.

Accordingly, the November 28, 1990, order of the circuit court that Ashley not receive any therapy and that there be no visitation between Ashley and the Procopios is reversed. The circuit court is directed to implement the recommendation of Dr. Leventhal that Ashley receive therapy, medical examinations, evaluations and treatment, and that there be visitations between Ashley and the Procopios.

We also reverse the August 29, 1989, circuit court order transferring custody of Ashley to her biological mother and father, and reverse the August 29, 1989, order vacating the DCFS guardianship of Ashley with right to place. We remand the case for a new hearing on the petition of the biological mother and father to transfer custody of Ashley to them. The hearing and decision shall be had and made posthaste. Until a decision is made, however, Ashley shall continue to live with her biologi-

cal mother and father unless the circuit court finds that exigent circumstances dictate otherwise.

At the new hearing on the petition of the biological mother and father to transfer custody of Ashley to them, the circuit court shall base its decision solely on the best interest of Ashley. Also, if the circuit court denies the petition of the biological mother and father, the circuit court is directed to conduct forthwith a dispositional hearing to determine the permanent custodial care of Ashley, including (1) whether she should be in foster care for a specified period; (2) whether the biological parents are unfit and their parental rights terminated and a guardian appointed authorized to consent to the adoption of Ashley; or (3) whether Ashley should be in foster care on a permanent or long-term basis. See 42 U.S.C. §675(5) (1988). Also see *In re J.J.* (1991), 142 Ill. 2d 1, 9, 566 N.E.2d 1345, 1349 (on the duty of the circuit court in wardship and custody cases (the circuit court must fulfill its duty to ensure the best interests of the minor and gather information bearing upon the current condition and future welfare of persons subject to the Juvenile Court Act)).

If the circuit court denies the petition of the biological mother and father to transfer custody of Ashley to them, and there is no procedure in place for compliance with 42 U.S.C. §675(5) (1988), then Illinois and the circuit court itself will be acting in violation of the Federal law. We make a hortatory statement to the Governor of Illinois and to the circuit court of Cook County that a proper procedure be in place or it may lead to loss of substantial Federal funding for our already desperate child welfare system. See *State of Vermont Department of Social & Rehabilitation Services v. United States Department of Health & Human Services* (2d Cir. 1986), 798 F.2d 57.

Reversed and remanded with directions.

CERDA, P.J., and WHITE, J., concur.