618 N.E.2d 598 (1993)
248 Ill. App.3d 168
188 Ill.Dec. 28
In re C.B., a minor.
Dorothy Petty, Petitioner-Appellant.
No. 1-92-1988.
Appellate Court of Illinois, First District, Fifth Division.
June 11, 1993.
*599 Steven A. Drizin, Northwestern University Legal Clinic, Chicago, for appellant.
Patrick T. Murphy and Ellen Gorin, Office of the Cook County Public Guardian, Chicago, for minor.
Justice MURRAY delivered the opinion of the court:
This appeal was brought by Dorothy Petty (Petty), the maternal grandmother of C.B., the minor in this case. Petty asks this court to reverse the order of the circuit court which awarded Tonya Wood (Wood), a nonrelative, private guardianship and physical custody of C.B. Petty alleges that the trial court erroneously believed it was bound to accept the expert testimony proffered in this case and, for that reason, failed to determine C.B.'s best interest by balancing all the attendant circumstances and factors. For reasons that follow, we reverse and remand for a new hearing to determine C.B.'s best interest.
The record in this case is rather scant, consisting only of a very limited social history and supplemental prepared by the Department of Children and Family Services (DCFS); a two-page "bonding assessment" entitled "psychological evaluation" which was completed sometime in August 1991 by Dr. Hirsch of the University of Illinois and his associate, Dr. Dursunkaya, after only three one-hour sessions with C.B.; and the testimony of witnesses presented at the guardianship hearing in this case. From these sources comes the following information:
C.B. was born December 17, 1989, to Donna B. (Donna), who was 21 years of age at the time. C.B.'s father is listed as unknown and no one claiming to be C.B.'s father has had any involvement in this case. Donna is the daughter of Petty, the petitioner in this case. Donna was born out of wedlock, although her parents married after her birth and then later divorced. Donna was raised by her mother and great grandmother, living with one or the other on an alternate basis.
In addition to C.B., Donna has given birth to two other children, a girl, K.B., born November 10, 1983, and a boy, J.B., born November 18, 1988. In July 1989, prior to C.B.'s birth, Donna came to the attention of DCFS when she admitted to hitting K.B. with a belt, leaving welts and bruises. As a result, Donna was found to be an abusive parent and K.B. and J.B. were made wards of the State. These two children were then placed in foster care with Petty, who was maintaining a household with her 15-year-old son, Charles, and Charles' friend, Kevin, who was abandoned by his parents and taken in by Petty.
Although Petty knew that a court order prohibited Donna from living in the same household as her children in foster care, Petty allowed Donna to move into her home in December 1989, just prior to C.B.'s birth. After C.B.'s birth, Donna and C.B. continued to live with Petty until Roseanna Sierra, a court appointed special advocate (CASA) worker, reminded Donna that she was in violation of the court order and had to leave. Consequently, in February 1990, Donna and C.B. moved into an apartment. This apartment, however, had no heat or electricity, so they spent little time there. During the day C.B. was cared for by a friend of Donna's and in the evenings, while Donna worked, C.B. was left with Petty. This situation continued for about two months until Donna was evicted from the apartment.
After being evicted in April 1990 Donna went to Ohio for two weeks. She did not take C.B. Instead she left him with a friend, Tonya Wood. Upon her return from Ohio it appears that Donna and C.B. moved back with Petty and the child care arrangements for C.B. that were in place prior to the Ohio trip were resumed, i.e., C.B. was watched by a friend during the *600 day (while Petty worked) and Petty watched C.B. each evening. It is clear that Donna took little responsibility for any of her children.
In September 1990, when C.B. was 8 months old, Donna decided to leave Illinois to go to Atlanta. Again, Donna did not take C.B. with her. However, Donna did not leave C.B. with Petty because Petty was unable to keep C.B. without obtaining guardianship. This was because Petty worked during the day and would have needed to obtain day care for him. Petty, however, could not afford to pay for the day care without the benefit of subsidies that would be available if she had guardianship.
Furthermore, Petty did not seek guardianship or custody of C.B. at that time because she believed that Donna intended to send for C.B. after she got settled in Atlanta. In addition, Petty did not seek guardianship of C.B. or attempt to assume responsibility for him because DCFS had indicated that Donna had to show responsibility in caring for C.B. if she was ever going to regain custody of her other two children and Petty wanted to give Donna every opportunity to become a mother to all of her children.
Consequently, Donna made alternative arrangements, deciding to leave C.B. with Wood because Wood would care for C.B. without requiring a transfer of guardianship to her. When Donna left C.B. with Wood, Wood was approximately 22 years old and living at home with her parents while attending nursing school. Wood's mother or a friend cared for C.B. during the day while Wood was at school and unavailable.
Donna, however, did not turn over all responsibility for C.B. to Wood. In actuality, C.B.'s care was a shared arrangement, i.e., C.B. stayed at Wood's during the weekdays and then visited with Petty on the weekends. In addition, Petty contributed to C.B.'s welfare by giving Wood money and food stamps on at least one occasion and by supplying other items for C.B. such as diapers, clothes and medicine on other occasions.
Initially CB.'s placement with Wood was an informal one[1], but in April 1991 circumstances changed. Sometime in late March or early April 1991 Petty discovered that Donna left Atlanta and went to California. It was then that Petty realized that Donna was never going to take responsibility for any of the children. In Wood's presence, Petty informed Roseanna Sierra, the CASA worker for K.B. and J.B., of the situation. Petty indicated at this time that she wanted to adopt all three of Donna's children. As a result, Sierra notified DCFS that Donna had abandoned C.B.
Shortly thereafter, Petty met with DCFS for a case review regarding K.B. and J.B. At this time Petty told DCFS workers that it was her intention to adopt all three of Donna's children. DCFS agreed to assist her with this goal. Nevertheless, despite Petty's contact with DCFS about her intentions and her consistent involvement with C.B., a petition for adjudication of wardship was filed regarding C.B. on April 5, 1991, without Petty's knowledge and without notice being given to her of the hearing on this matter. Because Wood was present at the hearing and already had physical custody of C.B. and because Petty was not present at the hearing to make her position known, the court awarded Wood temporary private guardianship and custody of C.B. on April 29, 1991.
How the petition for adjudication of wardship was filed without Petty's knowledge or involvement is not made clear in the record. Nonetheless, once Petty learned of the situation she moved to intervene and also filed a petition to vacate the order which awarded Wood temporary private guardianship. Petty then participated in the subsequent proceedings to determine C.B.'s permanent guardianship. Petty also continued to have weekend visitation with *601 C.B., although there is some indication that Wood was sometimes uncooperative and obstructionistic regarding these visits.
Because the issue of permanent guardianship pended, DCFS requested that a bonding assessment be done to assist in the permanent custody determination. Dr. Jay Hirsch and his assistant, Dr. Dursunkaya, performed the evaluation. Dr. Hirsch testified that he had been a child psychiatrist for 30 years and a professor of psychiatry at the University of Illinois since 1957. Dr. Dursunkaya testified that she had completed four years of residency in psychiatry but that she was currently training at the University of Illinois, under the direction of Dr. Hirsch, for a specialty in child and adolescent psychiatry. Her training in this field would not be completed until June 1993 and after that she would be eligible to take the Board certification examination for child psychiatry.
According to the testimony of Drs. Hirsch and Dursunkaya, Wood and C.B. were seen together on two occasions and Petty and C.B. were seen on only one occasion. Each session was held at the clinic and lasted for about one hour. For the first session Dr. Hirsch met with Wood and C.B., at which time he mainly interviewed Wood to obtain background information. For the second session C.B. and Petty came to the clinic and met primarily with Dr. Dursunkaya. While Dr. Dursunkaya observed C.B. she interviewed Petty for more background information. Dr. Hirsch was present only intermittently. The third session (the second session with Wood and C.B.) was conducted primarily by Dr. Dursunkaya, with minimal contact by Dr. Hirsch. In summary, the doctors' total contact with C.B. consisted of only three, one-hour sessions, all conducted at the clinic, wherein the majority of time was spent talking to the adult to obtain background information.
Based upon this limited contact, a two-page written report was prepared. The report is undated although it indicates that the sessions were conducted on July 29, August 14 and August 26, 1991. One entire page of the report consists of "salient historical background" and "current situation" and the data contained within these sections is, in some instances, inaccurate or unsubstantiated. The second page of the report contains a brief description of the doctors' observations of C.B., Wood and Petty. The report then concludes, in a single paragraph, that C.B. was "clearly attached" to Wood, his primary caretaker, and that disruption of this bonding at the "current sensitive period" of C.B.'s psychological development would be detrimental despite the existence of a caring grandmother who already cares for two of C.B.'s siblings in her home. The doctors recommended frequent visitation with the grandmother but continued guardianship by Wood.
Proceedings to determine permanent guardianship and custody for C.B. began in February 1992. On February 5, 1992, Drs. Hirsch and Dursunkaya each testified concerning the evaluation that was performed and the report that was compiled. No contact was had between these doctors and the parties subsequent to the report.
Both doctors admitted that their contact with the parties was extremely limited. Nevertheless, they both testified that their conclusion would probably not differ even if they had had a greater opportunity to be involved with the parties. This was because their opinion that C.B.'s best interests would be fostered by continuing Wood's guardianship and custody of C.B. was based upon the theory and belief that the psychological development of a child can be permanently impaired or damaged if that child is removed from his primary caregiver during the critical developmental period between the ages of 6 months and four years.
It should be noted that the doctors admitted that C.B. had bonded to both Wood and Petty and that either Wood or Petty would be appropriate care providers for C.B. The doctors also admitted that the family relationship and the presence of C.B.'s siblings in Petty's home were important considerations. Nevertheless, based upon their brief opportunity to observe C.B. with Wood and Petty, as well as, the very limited *602 and sometimes inaccurate background information at their disposal, they determined that C.B. considered Wood his primary caregiver or mother figure and, for this reason alone, it was contraindicated to disturb the status quo, i.e., placement with Wood.
Robert Lund, a DCFS worker, and Roseanna Sierra, the CASA worker assigned to K.B. and J.B., testified at the custody hearings on April 15 and 16, 1992. Both of these workers indicated that it was their recommendation to place C.B. in Petty's custody and that they were in favor of Petty's eventual adoption of C.B. The reasons for their recommendations were Petty's blood relation to C.B., the presence of C.B.'s siblings in her home, as well as her stability in the community, her experience and the proficiency she had exhibited in raising Donna's other two children. Sierra, who had been involved with Petty since December 1991, had made home visits and had witnessed Petty's relationship with C.B.'s siblings. Sierra reported that Petty was able to effectively provide for them physically and emotionally.
Lund was also pleased with Petty's handling of C.B.'s siblings and, in addition, indicated that C.B.'s mother, Donna, had told him that she wished C.B. to be placed with Petty. Unfortunately, neither Lund nor Sierra had ever witnessed C.B. in either Petty's or Wood's home. Therefore, neither one could testify concerning C.B.'s relationship with, or his behavior while in the presence of, either Wood or Petty.
Finally, on April 16, 1992, Wood and Petty each testified. It is clear from their testimony that they are both fit and caring individuals who are interested in providing a home for C.B. Wood testified that she had become a certified nurse's assistant and that, during the weekdays, she worked as a child care provider through DCFS and also baby-sat for a couple in Evanston. Due to the nature of her employment she was able to take C.B. with her when she worked. On the weekends Wood worked as a visiting nurse and C.B. was generally with Petty during these times. Wood also testified that she had moved out of her parents home and was now living in an apartment with C.B.
Petty's testimony showed her to be a stable individual who, for the past 15 years, was a resident of Evanston, maintained a job with the same company and was active in her church. Petty exhibited genuine concern for C.B. and expressed her desire to adopt all of Donna's children together.
On April 29, 1992, the trial court heard argument from all parties. The court indicated that it gave little credence to the bonding assessment that was performed. A discussion was apparently held, off of the record, regarding the possibility of postponing the custody decision until another bonding assessment could be completed. Because the discussion was off the record, we are unable to determine why this option was rejected. However, without the benefit of further evaluation or expert opinion, the court gave its decision as to C.B.'s custody.
The court stated that although it found the expert testimony as to the best interest of C.B. to be based upon inadequate observation, it "had to accept" the uncontradicted expert testimony which indicated that the period between the ages of 6 months and 4 years was the worst time to remove a child from its primary caregiver. The court found that the testimony was based upon psychological principles which were unrebutted by other expert testimony.
The court went on to express some concern over Tonya Wood's lack of a stable home setting and her lack of cooperation with C.B.'s weekend visitation with Petty. The court was also troubled by the fact that Petty, a blood relative, had custody of C.B.'s siblings and wanted to adopt all three children, which the court felt was a desirous situation. However, despite all of these considerations, the trial court determined that Tonya Wood should be appointed private guardian, stating the following:
"But in looking at all of the evidence and weighing it all, I'm still left with the expert's opinion, not as to what he feels is the best interest of the Minor because as I've said, that opinion, based upon *603 that limited observation, does not carry much weight but the statement to the worst time to remove the Minor from the primary caretaker, which Ms. Wood is and has been for the primary time is the worst time and that has not been contradicted either by Cross Examination or by any other expert."
Petty filed a motion to reconsider. At the hearing on this motion the court indicated that, based upon the expert testimony and the cases In re Ashley K. (1991), 212 Ill.App.3d 849, 156 Ill.Dec. 925, 571 N.E.2d 905, and In re Violetta B. (1991), 210 Ill.App.3d 521, 154 Ill.Dec. 896, 568 N.E.2d 1345, it believed that it had no choice but to rule as it did and, consequently, denied the motion. Petty then filed this timely appeal.
Petty raises several issues in this appeal and has introduced a number of treatises discussing, at considerable length, the merits, or lack thereof, of the psychological parenting theory. This court has neither the expertise nor the inclination to determine the validity of this psychological theory. Furthermore, the issue in this case is not the validity of the psychological parenting theory, but rather, whether the trial court gave undue weight to the testimony of the expert who applied this theory to the circumstances of this case.
After reviewing all of the evidence, this court finds that the trial court awarded Wood permanent custody and guardianship of C.B. based solely upon the recommendation of the expert testimony, not because it was particularly persuasive, but because it was unrebutted and because the court believed that the cases of Ashley K. and Violetta B. required such a result. We find, as Petty charges, that the trial court failed to exercise its own discretion by balancing all the factors that may be considered when making a reasoned decision concerning the best interests of a child. We also find that the trial court was remiss in making any determination when it was dissatisfied with the quantity and quality of the evidence presented. For these reasons, we reverse the trial court's determination and remand for further proceedings.
All custody decisions are difficult, but especially so where, as here, the court is placed in the unenviable position of having to choose between two capable, caring and fit individuals vying for custody of a single child. We sympathize with a trial court's difficult plight in cases such as this and realize that the trial court's Solomonic task is sometimes made even more difficult by the seemingly conflicting and contradictory case law and statutory law with which the court is charged to uphold.
However, much of the confusion stems from the fact that the prime directive in all guardianship and custody cases is the best interest of the child, (Moseley v. Goldstone (1980), 89 Ill.App.3d 360, 44 Ill.Dec. 779, 411 N.E.2d 1145), a standard which, although universally recognized and accepted, is illusive and difficult to define, making it subject to varying interpretations and opinions. It is clear that when the best interest of the child conflicts with the statutory preference for placement with a close relative (Ill.Rev. Stat.1989, ch. 23, par. 5007(b)), or even a natural parent's right to have custody restored, the best interests of the child takes precedence and will defeat all other considerations. (In re Violetta B.; In re Ashley K.; Ill.Rev.Stat.1989, ch. 37, par. 801-2(3)(c).) However, deciding what is in a child's best interest is difficult, if not impossible to predict without a crystal ball or the gift of foresight. Consequently, courts generally seek the opinions of experts in the field of psychiatry or psychology to assist them in deciding what is in the best interest of a child. However, trial courts must keep in mind that psychiatric expert opinions are only as valid as the bases and reasons supporting them. In re Violetta B., 210 Ill.App.3d at 535, 154 Ill.Dec. 896, 568 N.E.2d 1345.
Furthermore, by the very nature of a custody determination, a trial court makes decisions that have far reaching effects. Therefore, it is crucial that the fact finder have an abundance of information at his or her disposal to make a proper and reasoned "best interest" determination. If *604 a trial court feels that there is insufficient evidence from which it may make a reasoned decision regarding the custody and guardianship of a child, the trial court should seek additional information before reaching a decision. See In re J.J. (1991), 142 Ill.2d 1, 9, 153 Ill.Dec. 239, 566 N.E.2d 1345; Ill.Rev.Stat.1987, ch. 37, par. 801-2(2), in all proceedings brought under the Juvenile Court Act the court may direct the course thereof so as to promptly ascertain the jurisdictional facts and fully gather information bearing upon the current condition and future welfare of persons subject to the Act.
In the present case there was a glaring lack of competent evidence concerning C.B.'s situation. Although caseworkers were involved with Petty in relation to C.B.'s siblings, C.B. had no caseworker. No one had ever made home visits to observe C.B.'s relationship with Wood or Petty in the less "sterile" atmosphere of their homes and there was no evidence concerning the condition and suitability of Wood's and Petty's homes.
More importantly, there was no evidence, other than the completely inadequate bonding assessment, concerning C.B. and his reaction to Wood or Petty. There was no substantiated medical evidence to support the expert's application of the psychological parenting theory, i.e., evidence that would indicate that C.B. had, in fact, adopted Wood as his psychological parent and, thus, would be harmed by a change in custody. This is in stark juxta-position to the evidence presented in the Ashley K. and Violetta B. cases.
In In re Violetta B., the trial court was called upon to determine whether custody of the child "Minnie" should be given to nonrelative foster parents, who had parented Minnie since she was four months old, or to the child's paternal grandmother, who filed a petition for custody when Minnie was two years old. Extensive testimony was given by Thomas Leo, a family therapist who had been involved with Minnie for a number of years. He had written seven reports concerning Minnie and he was keenly aware of the child's background, as well as her current situation. Leo was able to testify concerning the child's behavior in the presence of the foster mother, her reaction to visitation with the grandmother and the effect that this visitation had on the child's emotional and psychological well-being. According to his testimony, Minnie considered her foster mother her real mother, she cried when she had to visit with the grandmother and exhibited "regressive behavior" when told that she might have tostay with the grandmother for a long time.
Leo's testimony was substantiated by the testimony of Dr. Roland, a clinical child psychologist and Ann Campos, a DCFS social worker. Both of these witnesses testified that Minnie made it clear through her behavior that her psychological well-being was dependent upon her continued relationship with her foster mother. Minnie became "depressed, combative, and aggressive when faced with visiting [the grandmother]."
Despite this considerable evidence the trial court disregarded the expert testimony and awarded custody of Minnie to her grandmother. On review the court, admitting that trial judges are free to disregard psychiatric testimony, held that the trial court improperly rejected the expert testimony, not because it was unfounded or unbelievable, but because the trial court found that the bonding between Minnie and the foster mother was caused by DCFS misconduct. For this reason, the reviewing court held that the trial court impermissibly ignored and discounted the expert testimony.
In In re Ashley K., Ashley, who was born addicted to drugs, was taken into custody by DCFS at birth and placed with foster parents by the time she was two months old. Ashley's parents, who were not married, were both drug addicts and the mother prostituted to support their habit. For more than three years the parents had little contact with Ashley while they continued their criminal and antisocial behavior, yet DCFS's goal remained to return Ashley to her parents.
*605 When Ashley was three, her mother completed a methadone program and DCFS instituted twice monthly visitations with Ashley. As a result, Ashley had to be admitted to Mount Sinai for an in-patient psychological evaluation to assess her "severe emotional and behavioral problems" related to these visitations. Based upon this assessment, Dr. Sonia Yballe, a child psychiatrist, and Dr. Alan Hirsch, a staff psychologist, recommended that Ashley be adopted by her foster parents. Nevertheless, DCFS continued visitation with the parents and Ashley continued to exhibit severe emotional and behavioral problems, including screaming, tantrums, vomiting on the way to visits and sleep problems.
At the insistence of the foster parents, Ashley was provided counseling at a Family Service Center. The psychologist who met with Ashley there noted that Ashley saw the visits with her biological parents as a threat to her life with her foster parents, whom she considered her parents. After counseling Ashley for eight months, he recommended that Ashley remain with the foster parents.
In December 1988, when Ashley was almost five years old, her biological parents petitioned to have Ashley returned. At the hearing on this petition Dr. Zinn, a psychiatrist and director of adolescent psychiatry at Northwestern Memorial Hospital, testified that he had done evaluations on Ashley, her parents and the foster parents. Based on these evaluations he believed that it was in Ashley's best interest to remain with her foster parents and that Ashley would suffer irreparable damage if returned to her natural parents. Dr. Zinn also found that Ashley's biological parents were not psychologically rehabilitated and did not have the emotional strength to adequately raise Ashley.
Despite this abundance of competent expert evidence, the trial court followed the recommendation of Dr. Anne Brown, an inexperienced psychologist who had no contact with the parties, and returned Ashley to her biological parents. Further, the trial court ordered that the foster parents refrain from any contact with Ashley.
On review this court determined that the trial court improperly balanced the best interest of the child against the rights of the parents, noting that the best interest of the child was not merely "part of the equation" but had to remain "inviolate and impregnable from all other factors."
It is true that the court then went on to state: "The circuit court cannot disregard expert medical testimony that is not countervailed by other competent medical testimony or medical evidence. Moreover, the circuit court, itself, cannot second-guess medical experts. If the circuit court does not follow medical evidence that is not refuted by other medical evidence, the circuit court is acting contrary to the evidence."
Despite the above quoted statement from Ashley K., we do not agree that this case, or the case of Violetta B., stands for the proposition that a trial court is compelled to follow the recommendation of the expert in custody matters, regardless of its credibility. Rather, we believe that the cases Ashley K. and Violetta B. reaffirm the notion that the best interest of the child is the paramount consideration and that qualified and competent medical testimony concerning the child for whom the custody decision is being made must not be disregarded when determining what is in that child's best interest.
In the present case there was no competent medical evidence to indicate that C.B. would be at risk if custody was transferred to his grandmother. Drs. Hirsch and Dursunkaya merely applied the theory of psychological parenting in the abstract, without any basis in fact for doing so. Although medical experts, they did not demonstrate that they had sufficient knowledge of the salient facts and circumstances surrounding C.B.'s condition and his emotional well-being to give qualified opinions concerning his best interests.
It seems clear that in the present case the trial court awarded Wood custody, with some reservation, because it felt that it could not disregard the psychiatric testimony. However, as stated earlier, neither *606 Ashley K. nor Violetta B. compels a trial court to abdicate its duty to exercise its own discretion and defer to the opinion of the expert, especially where, as here, there is insufficient basis for the expert opinion. Therefore, although considerable weight is generally given to the judgment of the trial court, which had the opportunity to view the witnesses and hear their testimony, a trial court's decision must be reversed if it is against the manifest weight of the evidence. (People ex rel. Edwards v. Livingston (1969), 42 Ill.2d 201, 247 N.E.2d 417.) For the reasons stated above we find that the trial court unreasonably relied upon expert testimony that was not shown to be relevant to the present case. We reverse the trial court's award of permanent custody and remand for further proceedings to determine what is in C.B.'s best interest.
We realize that in cases such as this we must work against the clock. The mere passage of time causes changes in circumstances over which we have little control. We, therefore, urge the trial court to gather the necessary information to make a best interest determination posthaste, so that C.B.'s future may be settled as soon as possible.
REVERSED and REMANDED.
McNULTY and COUSINS, JJ., concur.
NOTES
[1] There was some indication that when Donna left for Atlanta she led Wood to believe that she would send papers which would relinquish custody of C.B. to Wood indefinitely. Petty claimed to be unaware of any such arrangement and no papers were ever sent to Wood by Donna.