*In re* J.L., a Minor (The People of the State of Illinois, Petitioner-Appellee. v. T.A., Respondent-Appellant).

First District (3rd Division)   No. 1—97—0686

Opinion filed November 10, 1999.

Foley & Foley, of Chicago (Donna Hickstein-Foley, of counsel), for appellant.

Patrick T. Murphy, Public Guardian, of Chicago (Ron Fritsch, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Respondent, T.A., appeals from the order of the circuit court of Cook County that ruled that the permanency goal for one of respondent's children, J.L., should continue to be long-term foster care with

his paternal grandmother rather than his return to respondent's custody. We affirm.

## FACTS

On October 16, 1991, petitioner, State of Illinois, pursuant to the Juvenile Court Act of 1987 (705 ILCS 405/2—13 (West 1996)) (the Act), filed a petition for adjudication of warship for J.L., an infant who was born on June 18, 1991. On the same date that the petition was filed, the Illinois Department of Children and Family Services (DCFS) was awarded temporary custody of J.L., based on a finding that there was probable cause to believe that J.L. was neglected, abused, or dependent. Respondent had a drug addiction and abused alcohol.

On November 26, 1991, respondent's other children, T.A. (here and hereinafter "T.A." is used to refer to respondent's child and not to respondent herself), who was born June 23, 1984, and M.A., who was born March 26, 1990, were adjudicated wards of the court. M.A. had been born with cocaine in her system and had been removed from respondent's care when she was three days old. T.A. lived with respondent for 4¹/₂ years before being removed from respondent's custody in 1990.

At a September 14, 1992, dispositional hearing, the court heard evidence that J.L.'s parents had been arrested for robbery in October 1991 and that respondent had not completed all the requirements of a DCFS service plan. In a dispositional order, the court made the finding that J.L. was neglected and that appropriate services aimed at family preservation and family reunification had been unsuccessful. J.L. was made a ward of the court, pursuant to section 2—22(1) of the Act (705 ILCS 405/2—22(1) (West 1996)). (According to respondent's testimony at a later time, the robbery charge against her had been dismissed.)

After respondent's children were removed from her custody, respondent received intensive inpatient and outpatient treatment and conventional outpatient treatment; some of her participation was voluntary. She attended Alcoholics Anonymous meetings, support groups, parenting classes, and individual counseling sessions, the latter which she initiated on her own. Respondent was given random drug tests twice a month.

The record does not contain the exact dates, but at some point all three children were placed with their maternal grandmother in Chicago. J.L. lived with his maternal grandmother only for a few months; he was removed from her care when he was about nine months old because she failed to obtain emergency medical treatment for his third-degree burn. He was then placed in his paternal grandmother's home in Wisconsin, where he has remained.

In February 1993, respondent was granted supervised visits with J.L. In May 1993, DCFS was ordered to provide the means for respondent's transportation to Wisconsin so that she could exercise visitation. In December 1994, the trial court granted respondent unsupervised day visits with J.L. and the other children once a month and gave DCFS the discretion to increase visitation.

On July 20, 1995, upon respondent's motion alleging negative drug tests for 2½ years, the trial court granted unsupervised overnight visits at DCFS's discretion. Beginning January 27, 1996, respondent was allowed once-a-month weekend visitation with an overnight visit on Saturday night.

On May 6, 1996, DCFS completed a client service plan for respondent that selected the goal of all the children returning home to respondent.

On July 23, 1996, respondent filed a motion to vacate the placement orders for her children, seeking the return of their custody. The motion was apparently made pursuant to section 2—28(4) of the Act, which permitted application to the court for restoration of the minor to a parent's custody. 705 ILCS 405/2—28(4) (West 1996).

The hearing on respondent's motion was held on October 15, 1996. At that time respondent had been visiting weekly with M.A. and T.A. and monthly with J.L., who was then five years old. The trip for respondent to see J.L. in Wisconsin was 1½ hours if she drove and three hours if she used public transportation. By the time of the hearing, respondent had completed all the requirements set by DCFS and was continuing in individual and family counseling. Respondent's drug tests had been negative for three years. Since recovering from drug addiction, respondent had consistently been employed in office or store clerk positions. Respondent was living in her own home.

Cheryl Conner testified at the hearing that she was a DCFS worker and that she had been assigned to the J.L. case only recently, in April 1996. She worked with the father, and Central Baptist Family Service worked with respondent. Respondent's visits had been going well. She agreed with the goal of the service plan that was prepared by a previous DCFS worker that J.L. return home. She did not recommend that the return of custody be made immediately; she recommended that J.L.'s return be made after an increase in visitation with respondent.

Michelle Ware testified at the hearing that she was the worker from Central Baptist Family Services who was assigned to work with respondent's children T.A. and M.A. Her agency had not been involved with J.L.'s removal. She testified that she could not make a recommendation because she was not assigned to J.L.'s case.

Admitted into evidence at the hearing was the report that DCFS

requested of Lynn McIntyre, a licensed clinical social worker with a doctorate degree. Dr. McIntyre reported that respondent had experienced significant problems in independently functioning as an adult and as a parent. Respondent's cognitive, emotional, and subsequent substance abuse problems resulted in her less than fully mature development into adulthood. Respondent had obviously come a long way emotionally and behaviorally since her days of drug addiction, but respondent had taken a long time to reach the point at which she now found herself. A psychological evaluation done in October 1994 indicated that respondent had a dysphoric or depressed mood that she often denied or repressed. Respondent was within the low average range of intellectual ability (IQ 82). Dr. McIntyre reported serious reservations about respondent's emotional regularity and stability and about whether respondent would be able to meet the needs of all three children. Respondent had trouble with organization, which was a large part of parenting, and with regularity and the assumption of responsibility. Respondent expected her children to accept what she had to offer them. Respondent was struggling with organizing her life and would get frustrated and angry when others were not as organized as she wanted—a reflection of respondent's narcissistic needs. Respondent was still establishing herself as a competent adult, including stabilizing her career. Respondent needed to do this now, but it meant that she was limited in her ability to fully parent.

Dr. McIntyre's report further stated that, although respondent was able to have unlimited visitation with her daughters who resided nearby, respondent visited only on weekends. Respondent needed to rely heavily on her parents in order to take care of her children.

Dr. McIntyre's report further stated that it would be a dramatic shift in lifestyle and focus for respondent to parent her two daughters. As a result of respondent's significant substance abuse problems, T.A. was significantly cognitively and emotionally delayed. T.A. asked for a lot of attention and physical attention from her mother. T.A. would become angry with J.L. when respondent attended to him. T.A. needed respondent's help to work through a lot of emotional and special-education problems. Respondent had a lot of work to do assisting M.A. to accept respondent into her life.

Dr. McIntyre's report further stated that J.L.'s paternal grandmother had a much better ability to be regulated, predictable, and reliable than respondent. J.L. was most attached to his grandmother, who was consistent, loving, and protective of him—she was his psychological mother. The stability, regularity, and affection his grandmother had given him over the years had been the emotional foundation that had allowed him to develop into a fairly healthy child.

To tear J.L. from his grandmother would do him irreparable harm: he would be forced to adjust externally, but the internal loss would affect him profoundly.

At the conclusion of the hearing, the trial court made the following oral rulings. The paternal grandparents did not wish to adopt J.L. It was not appropriate to return J.L. home because of the irreparable harm he would suffer. The transition might have been easier for J.L. two or more years ago had respondent then been functioning at her present level. The trial court ruled that the permanency goal should continue to be long-term foster care with J.L.'s paternal grandmother. In addition, the trial court increased visitation of J.L. for respondent to twice a month. The trial court set a hearing date for respondent's request that her other children be returned home, and another permanency hearing was set for August 8, 1997.

Respondent appealed pursuant to Supreme Court Rule 304(b)(1) (134 Ill. 2d R. 304(b)(1)) as provided by the Juvenile Court Act of 1987 (705 ILCS 405/2—28(3) (West 1996)).

## ANALYSIS

■ The hearing on respondent's motion was conducted pursuant to the Juvenile Court Act of 1987, which provided for a "permanency hearing" at which time the court was to determine the future status of the child and to review, among other matters, the appropriateness of the "permanency goal" set by a "service plan." 705 ILCS 405/1—3(11.1), 2—28(2) (West 1996). Under the Act, the applicable permanency goals that the court could have ordered in this case were that J.L. return to a parent, continue in long-term relative foster care, or be placed for adoption. 705 ILCS 405/1—3(11.1), 2—28(3) (West 1996).

■ Section 2—28(2) of the Act in effect at the relevant time set forth the standard of review to use in reviewing a DCFS permanency goal:

"[T]he standard of review to be employed by the court shall be whether [DCFS], in setting the permanency goal *** abused its discretion in light of the best interests of the child, the permanency alternatives, and the facts in the individual case." 705 ILCS 405/ 2—28(2) (West 1996).

■ In determining whether a minor should be restored to the custody of a parent, the single issue is the best interest of the child. *In re Ashley K.*, 212 Ill. App. 3d 849, 879, 571 N.E.2d 905 (1991). When considering a permanent placement, "[a] child's best interest is not part of an equation. It is not to be balanced against any other interest. *** [A] child's best interest is and must remain inviolate and impregnable from all other factors ***." *Ashley K.*, 212 Ill. App. 3d at 879. The best interest of the child takes precedence over even a natural parent's superior right to custody of his child. *In re Violetta B.*, 210

Ill. App. 3d 521, 533, 586 N.E.2d 1345 (1991). Among the appropriate matters to be considered are the nature and length of the child's relationship with the present caretaker and the effect that a change of placement would have upon the emotional and psychological well being of the child. *Violetta*, 210 Ill. App. 3d at 534.

■ Although a trial court is not compelled to follow the recommendations of an expert in custody matters, qualified and competent medical testimony concerning the child for whom the custody decision is being made must not be disregarded when determining what is in that child's best interest. *In re C.B.*, 248 Ill. App. 3d 168, 179, 618 N.E.2d 598 (1993), citing *Ashley K.*, 212 Ill. App. 3d at 890.

■ The disposition of a minor pursuant to the Act is a matter committed to the sound discretion of the court. *In re Beatriz S.*, 267 Ill. App. 3d 496, 500, 641 N.E.2d 953 (1994). The review of a dispositional order must be made in light of all the purposes and policies of the Act, and the overriding purpose of the Act to which all other goals are subordinate is the best interest of the child involved. *Beatriz S.*, 267 Ill. App. 3d at 500.

■ Respondent argues on appeal that the trial court erred in not setting the goal that J.L. be returned to her custody because she had met all the requirements imposed by DCFS, which recommended that all her children be returned to her. The hearing was not about the best interest of the respondent. The hearing was only about what is in the best interest of the child. Respondent's ability to parent was not a determinative factor. But even considering the parenting evidence, the evidence does not weigh in respondent's favor.

It is undisputed that respondent successfully completed drug addiction treatment and had undergone psychotherapy. Respondent's commendable success in meeting the DCFS's service plan requirements, however, does not automatically earn her a right to the return of custody of J.L., as respondent implies. J.L. was removed from her as an infant. Respondent did not begin visitation until February 1993 at the earliest, when J.L. was around 18 months old. The visitation was only monthly. Respondent's progress took several years. In the meantime, J.L. bonded with his paternal grandmother, with whom he began living as an infant. J.L. is now eight years of age.

Respondent has ignored Dr. McIntyre's comprehensive report; it discussed respondent's deficiencies in parenting abilities, which are especially compelling because one of her children is cognitively delayed and demands much attention from respondent. The trial court relied on this report, especially noting Dr. McIntyre's concern for the irreparable harm to J.L. that would occur if he were taken away from his psychological mother. A concern about a sudden separation from J.L.'s

grandmother was implicit even in the testimony of the caseworkers who believed that J.L. should be returned to respondent: none of them recommended that the return be immediate.

We do not find that the trial court's weighing of the evidence, which included conflicting custody recommendations, was an abuse of discretion.

The judgment of the trial court is affirmed.

Affirmed.

CAHILL, P.J., and WOLFSON, J., concur.