*In re* YOLAINE J., a Minor (The People of the State of Illinois, Respondent-Appellant; Yolande J. *et al.*, Respondents-Appellees).

First District (3rd Division)   No. 1—93—1777

Opinion filed July 19, 1995.

Patrick Murphy, Public Guardian, Pretzel & Stouffer, Chartered, and Lord, Bissell & Brook, all of Chicago (Kathleen G. Kennedy, Anne Scheitlin Johnson, Diane L. Jennings, and Kathryn C. Wyatt, of counsel), for appellant.

Marshall J. Schmitt and William E. Meyer, Jr., both of Jenner & Block, of Chicago, for appellees.

JUSTICE RIZZI delivered the opinion of the court:

Pursuant to juvenile court proceedings, on September 17, 1990, Yolaine J. was removed from her home in Chicago and placed in foster care with a family in Evanston. She was three years old. On October 1, 1990, she was adjudged a ward of the court and placed in the custody and guardianship of the Department of Children and Family Services (DCFS). The court based its ruling on findings that Yolaine's father, Saurel J., sexually abused his other daughter, Magdalene, and that Yolaine's mother, Yolande J., was unable to provide a safe environment for Yolaine. Several months earlier, Saurel had pled guilty to criminal charges of sexually abusing Magdalene. Magdalene had been removed from the home on March 3, 1989. She has since reached adulthood and her status is not an issue.

After participating in court-ordered therapy, Yolaine's parents petitioned the court for her return on July 26, 1991. On March 22, 1993, the court ruled that it would be in Yolaine's best interest to gradually return to her mother's custody. On April 12, 1993, the court entered another order which provided that the goal "shall be to return the child Yolaine to her mother Yolande sometime during the summer of 1993," and that Yolande shall ensure that Yolaine have no contact with Saurel while she is in Yolaine's custody unless under DCFS supervision. The order also provided that it shall remain in effect until April 12, 1994.

The office of the public guardian, Yolaine's guardian *ad litem*, ap-

pealed the orders of March 22 and April 12, 1993. On August 27, 1993, Yolaine returned to live with her mother. Saurel, however, is precluded from living in the home pursuant to the April 12, 1993, order. Meanwhile, the appellate court entered an order which provides: "The order of protection entered in the circuit court on April 12, 1993 shall remain in effect until further order of the appellate court. Specific attention is called to that part of the order which provides that the mother shall ensure that the minor has no contact with father while in mother's custody unless under DCFS supervision."

Generally, the public guardian contends that the March 22 and April 12, 1993, orders should be reversed and that Yolaine should not have been removed from foster care and returned to live with her mother. We affirm in part, vacate in part, and remand with directions.

Saurel and Yolande emigrated from Haiti to Chicago between 1983 and 1985. Saurel is functional in English, but is lacking in some concepts of the language. Yolande is unable to communicate in English. Their native language is Haitian Creole.

At the time that Saurel and Yolande came to Chicago, they were married and had three sons, Luckner (the oldest), Guilliano, and Saurel Jr. (the youngest). In 1985, Magdalene, Saurel's daughter from a prior relationship, left Haiti and her mother to join her father in Chicago. Magdalene was 13 years old at the time. She was sent to live with her father because her mother was having a "difficult time controlling her."

On May 26, 1987, Yolande gave birth to Yolaine, and Yolande and Saurel lived with their four children and Magdalene in a two-bedroom apartment in Chicago. Saurel held two jobs. He worked as a doorman in a high-rise building, and he worked a few nights a week in a grocery store. Yolande baby-sat during the daytime for a family living in the building where Saurel worked as a doorman.

According to Magdalene's testimony in juvenile court, in July or August of 1987 when she was 15 years old her father "raped" her. She remembered when it was because she had a summer job at school. She remembered that it happened on a Friday because she left work early on Fridays. Her father picked her up in a car and told her they were going to see his friend. They then drove to a motel on 95th and Stony Island in Chicago.

Saurel told Magdalene to wait in the car while he went inside and returned with a white sheet and some keys. She did not know what her father was going to do. They pulled up in front of the motel room, parked and got out of the car. Her father unlocked the door to the room. She told her father that she thought they were going to see

a friend. Her father told her to wait and see and to come and have a seat in the room. Nobody else showed up.

Inside the room, Magdalene sat on a chair and her father sat on the bed. Her father watched a television channel which showed people having sex. She asked her father why they were there. Her father told her to watch and enjoy. Then her father turned off the television and told her to lie down with him. She said that she wanted to go home. Her father started hitting her and pushed her on the bed. Her father then told her to take off her clothes, which she did because she was scared. Her father's shirt was already off; he removed his pants and underwear. Then her father got on top of her and had intercourse with her, and performed oral sex on her. She saw her father ejaculate on the bed.

Magdalene tried to fight her father's actions but he told her that she was his daughter and that he could do whatever he wanted. She told him that she was going to tell what happened. Her father responded that nobody would believe her and that he would kill her if she told anyone.

When it was over, her father gave her a douche and told her to use it to prevent a pregnancy. She did not know what a douche was, but used it anyway. She was bleeding and in pain. Her father told her to sit in the shower and turn on the cold water. She then sat in the shower for about 10 minutes.

Two or three days later Magdalene was in pain and "walking kind of funny." Yolande commented that she did not seem like the same person and asked her what was wrong. Magdalene told her what happened. Afterward, the abuse stopped. Her father, however, continued to hit her when no one was home and he would ask her about doing the same thing again. She would answer "no," and he would hit her. This would happen three or four times a month, usually on Fridays, when her father was not working. During these times, Yolande was at work and the other children were not home.

In February 1989, when Magdalene was 17 years old, the sexual abuse started again. It was about a week after Magdalene's birthday on February 3. Saurel gave her some money to go shopping. When she returned, her little brother, Junior, was watching television with her father. She showed her father what she bought and watched television with them. Her father then told Junior to leave and go play with his toys.

Saurel then locked the door and Magdalene asked him "[W]hy?" He told her that she will find out. He then started talking "sweet stuff" and kissing her neck. She told him to stop. He did not stop, but began hitting her. She fought back and tried to pick up the telephone.

He unplugged the telephone and pushed her on the bed. He told her that he would kill her if she called anyone. He then told her to take off her clothes or he would shoot her. He pulled her shirt off. He was wearing a pair of shorts and a T-shirt and took them off. Magdalene testified that her father then got on top of her and "raped" her.

Later, Magdalene told Yolande what happened. Yolande told Magdalene that she did not believe it. Magdalene told Yolande not to tell her father, because she was afraid he would beat her. Yolande told Magdalene that she would not tell him, but would approach him. Yolande, however, told Saurel everything in another room. Fifteen minutes after Magdalene had told Yolande, she was called into the room by Yolande. Her father was in the room crying. Magdalene repeated the story before both Yolande and her father.

Afterwards, Yolande went out to a party. Magdalene was left home alone with her father. He entered her room where she was watching television and began beating her. He said he told her not to tell anybody and that he was going to kill her. He punched her in the face and she bled from the nose.

On Sunday, February 26, 1989, Magdalene went to church with Yolande, her oldest brother, Luckner, and Yolaine. At church, Magdalene saw a lady named Guerdy, who was a director in the church. Guerdy asked her why she did not look happy. She said that she was scared and Guerdy was the only one she could trust. She told Guerdy what happened with her father. Guerdy started to cry. Guerdy then told another woman in the church. They told Magdalene to tell a teacher at school. They also called her brother, Luckner, and told him what happened.

On Tuesday, Magdalene was in her room watching television when her father went in and asked her if they were going to do the same thing they usually did on Fridays. She told him to get out of her way. She thought that "this was too much." She told her father to get out of her room and that he made her sick. After he left, she went to the kitchen to get a knife and put it under her pillow.

On Wednesday morning, March 1, 1989, Magdalene went to school. She was in her science class and asked her teacher if she could go speak to her French teacher, Ms. Gabrielle. Gabrielle knew most of her family and Magdalene felt that she was the only one around for her. She told Gabrielle every detail of what happened. Gabrielle called Magdalene's brother, Luckner, and told him what happened, but he already knew. Gabrielle then called the principal and reported the sexual abuse to official authorities.

On March 3, 1989, based on allegations that were made by Magdalene, DCFS petitioned the juvenile court for an adjudication of

wardship on behalf of Yolaine. The petition alleged that Yolaine was being neglected in that her environment was injurious to her welfare as set forth in section 2—3 of the Juvenile Court Act of 1987. (See 705 ILCS 405/2—3(1)(b) (West 1992).) The court entered an order of protection the same day, prohibiting Saurel from living in the family home until a temporary custody hearing was concluded. The court also granted DCFS temporary custody and appointed the public guardian's office as guardian *ad litem* for Yolaine. On March 3, 1989, Yolaine was removed from her home.

On March 17, 1989, the court entered an order returning Yolaine home, continuing the prohibition against Saurel living in the family home until further order of the court, prohibiting any contact between Saurel and Yolaine, directing a physical examination of Yolaine and directing Saurel and Yolande to attend counseling. It was sometime around this point that criminal proceedings were initiated against Saurel for sexually abusing Magdalene.

The juvenile court case proceeded toward an adjudicatory hearing.[1] The hearing continued over several dates. Meanwhile, sometime in May of 1990, in a criminal court case Saurel pled guilty to a criminal offense stemming from his sexual abuse of Magdalene.[2] He was sentenced to 90 days' home confinement and two years' probation. He was also ordered to participate in counseling for sexual offenders.

On June 8, 1990, the juvenile court made an independent determination that Saurel had sexually abused Magdalene. The court,

---

[1]In this context, an adjudicatory hearing is a hearing to determine whether allegations contained in a petition filed on behalf of a minor are supported by a preponderance of the evidence. In contrast, a dispositional hearing is a hearing to determine whether a minor should be adjudged a ward of the court and what arrangements shall be made for the care of that minor. 705 ILCS 405/1—3(1), (6) (West 1992).

[2]The report of proceedings from the criminal proceeding was not filed with the record on appeal. The record as it exists contains very few specifics regarding the criminal proceedings, and what was adduced was mostly done so indirectly, *i.e.*, through the reports and testimony of various therapists. In fact, the whole extent of Saurel's testimony in this record consists of a mere two pages. Moreover, the only questions asked of Saurel concerned whether he would avoid contact with Yolaine if that meant that she could be returned to her mother.

We do not know for what specific crime Saurel was convicted, or the date he was convicted. It appears from the record, that he was convicted sometime during May 1990, and that his 90-day home detention ended on October 1, 1990.

therefore, ruled that Yolaine was neglected in that her environment was injurious to her welfare. The case was then continued for a dispositional hearing. Yolaine, meanwhile, remained in her mother's custody, and the order of protection prohibiting contact between Yolaine and her father remained in force.

Before the dispositional hearing was had, the public guardian's office, on September 17, 1990, petitioned the court for supplemental relief, asking the court to award temporary custody of Yolaine to DCFS. The petition alleged that Yolande and Saurel had violated the order of protection by allowing unsupervised contact between Saurel and Yolaine. Based on the petition, the court found that there was probable cause to believe that Yolaine was neglected and awarded temporary custody to Gary T. Morgan of DCFS. Since the transcript of that hearing was not made part of the record on appeal, and the petition itself contains no allegation of fact, it is difficult to tell exactly the factual basis upon which the removal was made. However, it appears from comments made at later hearings by the attorneys for the parents and from the public guardian's office that the violation involved Saurel delivering groceries to the family and driving the family to therapy sessions.

On September 17, 1990, Yolaine was placed in foster care with a family in Evanston. On October 1, 1990, the court conducted a hearing on the original petition and entered a dispositional order finding that Yolaine had been neglected, that her mother was unable to care for or protect Yolaine, that appropriate services aimed at family preservation and family reunification had been unsuccessful, that reasonable efforts had been made to prevent or eliminate the need for removal of the minor from the home and that it was in the best interest of Yolaine to take her from such custody. Accordingly, the court found that it was in Yolaine's best interest to be adjudged a ward of the court. The court did not set forth the precise factual findings upon which the best-interest determination was made. It is fair, however, to infer from the evidence put on at the hearing that the determination was based upon the court's earlier finding of sexual abuse, a criminal conviction of sexual abuse, a violation of the no-contact order, the parents' failure to attend court-ordered therapy, and that Yolaine would be at risk of being sexually abused.

The court, therefore, ordered that Yolaine be placed in the custody and guardianship of Gary T. Morgan of DCFS. The written order provided that the custody shall continue until Yolaine becomes 21 years old, unless otherwise ordered by the court. Additionally, when it announced its ruling, the court stated, "We would like to see this child placed with a parent, but things have to be done before

that can happen. I will enter any orders and be as aggressive as I can to see that those things happen." Meanwhile, Yolaine, remained with her foster family in Evanston.

It was October 1, 1990, the date of the dispositional hearing, which marked the onset of therapy. Since then every member of the J. family has undergone or participated in therapy with a litany of mental health professionals, including psychiatrists, psychologists, social workers and psychotherapists. Such therapy continues currently.

On February 20, 1991, the court entered an order directing supervised visitation between Yolaine and her parents once a week on Fridays. On July 26, 1991, Yolaine's parents petitioned the court to return Yolaine to her mother's custody. Hearings on the petition for return were conducted over a 15-month period beginning on January 3, 1992.

On March 22, 1993, based on the testimony of mental health experts, the court found that it was in Yolaine's best interest to gradually return to her mother's custody under a transition plan. Pursuant to the transition plan, on April 12, 1993, the court entered an order of protection that provided, among other things, the following: (1) the goal of the plan shall be to return Yolaine to her mother sometime during the summer of 1993; (2) DCFS shall retain guardianship until further order of the court; (3) the "mother shall ensure that the minor has no contact with father while in mother's custody unless under DCFS supervision"; and (4) that the order shall remain in effect until April 12, 1994.

On August 27, 1993, pursuant to the court's order of April 12, 1993, Yolaine was returned from foster care to live with her mother. She is currently living with her mother in accord with the order of the appellate court which provides: "The order of protection entered in the circuit court on April 12, 1993 shall remain in effect until further order of the appellate court. Specific attention is called to that part of the order which provides that the mother shall ensure that the minor has no contact with father while in mother's custody unless under DCFS supervision."

On appeal from the March 22 and April 12, 1993, orders, the public guardian contends that "because Yolaine's mother denies that Yolaine's father sexually abused Magdalene, she is unable to protect Yolaine from similar abuse," and that "the court's order is contrary to the overwhelming evidence of Yolaine's fear and her stability in her foster home." While we believe that the concerns of the public guardian in this case are understandable and well intended, we conclude that the two orders that were entered were proper except

for the self-termination date of the April 12, 1993, order as it relates to protecting Yolaine from the risk of incest.

Dr. Robert Evans, a licensed clinical social worker, Dr. Lawrence Heinrac, a licensed clinical psychologist, Dr. Christina Cruz, a physician and fellow in child and adolescent psychiatry at Rush-Presbyterian Medical Center, and Dr. Margery Johnson, a psychiatrist at Rush-Presbyterian Medical Center, all testified that Yolaine should be returned from foster care to live with her mother. There was no contradictory medical testimony. Also, the public guardian's reference to "Yolaine's fear" is unfounded. Although Yolaine did express a preference to live with her foster parents rather than her mother and father, there is nothing in the record to demonstrate any genuine fear about being returned to live with her mother. Moreover, Yolaine was asked and answered in court: "Q. Do you believe your real mother loves you? A. Yes." She was also asked and answered: "Q. Has your real mother ever done anything to hurt you? A. No. Q. How about your brothers? A. No."

In addition, while the record does demonstrate that Yolaine is an emotionally stable and well adjusted child for her age, the three years that Yolaine lived with her foster parents are not well documented in the record. What is most notably lacking from the record is any testimony from the foster parents. That neither foster parent was called to testify during 15 months of hearings to determine Yolaine's best interest leaves a cloud of wonder over the proceedings. The lack of testimony from the foster parents, at least, evinces that the record does not establish that there was "overwhelming evidence" of stability in the foster home as argued by the public guardian.

Moreover, the record shows that Yolaine was interviewed extensively by the juvenile court judge, Robert M. Smierciak. In his interview, he elicited her feelings in an environment free of coercion and hostility. It was only after hearing the testimony of the expert witnesses and conducting an extensive interview of Yolaine that Judge Smierciak entered the orders in this case. Under the circumstances, with the exception of there being no testimony from the foster parents, everything possible to determine Yolaine's best interests was done in this case, and the record demonstrates that it was done with exemplary care and caution.

The only disagreement that we have with the orders that were entered in the juvenile court is the self-termination provision in the April 12, 1993, protection order as it relates to protecting Yolaine from the risk of incest. The order provides that it shall remain in effect until April 12, 1994. Since the protection order was to protect

Yolaine from the risk of incest based on her father's past conduct with his other daughter, the order should not have a self-termination date with regard to protecting Yolaine from the risk of incest during her minority.

Incest is a crime that is plainly so odious and appalling to the mores of our society and absolutely contrary to the interests and well-being of any child that an order protecting a child from the risk of incest should not be self-terminating in that regard during the minority of the child. Rather, a proscription in a court order protecting a child from the risk of incest should be terminated only after there has been an evidentiary hearing and the trial court makes a determination that the child is no longer at foreseeable risk of incest if the child has unsupervised visitation with his or her parent. Moreover, the child's judicial protection from incest must be unyielding and may not be compromised for the purpose of family unification. There is no equation involved when it comes to protecting a child from the risk of incest. See *In re Ashley K.* (1991), 212 Ill. App. 3d 849, 879, 571 N.E.2d 905, 923.

Accordingly, the provision in the April 12, 1993, juvenile court order that the order shall remain in effect until April 12, 1994, is vacated. The March 22 and April 12, 1993, orders are otherwise affirmed. The case is remanded with directions that the provision in the April 12, 1993, order that Yolande shall ensure that Yolaine has no contact with Saurel unless under DCFS supervision shall remain in effect during Yolaine's minority or until such time that the trial court conducts an evidentiary hearing and makes a determination that Yolaine is not at foreseeable risk of incest if she has unsupervised visitation with Saurel. The trial court shall conduct further proceedings to determine whether the other provisions in the March 22 and April 12, 1993, orders shall be modified, extended or terminated based on current circumstances and the best interests of the minor. See 705 ILCS 405/2—25(4) (West 1992).

Affirmed in part; vacated in part and remanded with directions.

TULLY and CERDA, JJ., concur.